**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Marc Fiedler, *et al.*,

           Plaintiffs,

        v.

MHG Café Dupont, LLC,

1601 Connecticut Avenue, N.W.

Washington, DC 20009

           Defendant.

Civil Action No. 1:08CV00225 (PLF)

## DEFENDANT MHG CAFÉ DUPONT, LLC'S
## PARTIAL MOTION TO DISMISS PLAINTIFFS' COMPLAINT
## OR TO STRIKE CERTAIN ALLEGATIONS

      For the reasons stated in the accompanying memorandum, defendant MHG Café Dupont, LLC, respectfully moves (i) to dismiss or, alternatively, to strike the allegations of paragraphs 35(a) and (c) and 36 of the Complaint (and related claims) as moot pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure; and (ii) to dismiss Count II (the "Second Claim for Relief") of the Complaint, which asserts a violation of the District of Columbia Human Rights Act, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Respectfully submitted,

Dated:  March 24, 2008

F. JOSEPH WARIN, D.C. Bar No. 235978
JASON C. SCHWARTZ, D.C. Bar No. 465837
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue N.W.
Washington, District of Columbia 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

Attorneys for Defendant
MHG CAFÉ DUPONT, LLC

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Marc Fiedler, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:08CV00225 (PLF) |
| MHG Café Dupont, LLC, | |
| 1601 Connecticut Avenue, N.W. | |
| Washington, DC 20009 | |
| Defendant. | |

**DEFENDANT MHG CAFÉ DUPONT, LLC'S
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS
PARTIAL MOTION TO DISMISS PLAINTIFFS' COMPLAINT
OR TO STRIKE CERTAIN ALLEGATIONS**

F. Joseph Warin, D.C. Bar No. 235978
Jason C. Schwartz, D.C. Bar No. 465837
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

I. INTRODUCTION AND SUMMARY OF ARGUMENT .......................................... 1

II. BACKGROUND ..................................................................................................... 1

III. ARGUMENT .......................................................................................................... 5

    A.       Three Of Plaintiffs' Six Claims Are Now Moot Due To Defendant's Voluntary Remediation Efforts. ........................................................... 5

    B.       Plaintiffs' DCHRA Claims Should Be Dismissed Because The Allegations Of ADA Violations Are Not Sufficient Predicates For The DCHRA Claims. ...................................................................................... 9

           1.       The DCHRA Does Not Require The Same Affirmative Steps As The ADA. ..................................................................................... 10

           2.       Plaintiffs' Claim Fails To State A Claim For Unlawful Discrimination Under The DCHRA. ........................................... 17

CONCLUSION ........................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed. of Labor & Cong. of Indus. Orgs. v. Fed. Election Comm'n*, 333 F.3d 168 (D.C. Cir. 2003) ..................................................................................................13

*Arthur Young & Co. v. Sutherland*, 631 A.2d 354 (D.C. 1993) ....................................14

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ......................................................9

*Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health and Human Res.*, 532 U.S. 598 (2001).......................................................................................................7

*Chang v. Institute for Public-Private P'ships, Inc.*, 846 A.2d 318 (D.C. 2004)............16

*Cook v. Edgewood Mgmt. Corp.*, 825 A.2d 939 (D.C. 2003).........................................15

*East v. Graphic Arts Indus. Joint Pension Trust*, 718 A.2d 153 (D.C. 1998) ..............10

*Eiden v. Home Depot USA, Inc.*, No. Civ. S-04-977, 2006 U.S. Dist. LEXIS 38423 (E.D. Cal. May 26, 2006).............................................................................................7, 8

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167 (2000) ......................8

*GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381 (10th Cir. 1997) ........2, 9

*Grant v. May Dep't Stores Co.*, 786 A.2d 580 (D.C. 2001) .....................................14, 16

*Green v. DOD Dependent Schools-Europe*, 514 F. Supp. 2d 79 (D.D.C. 2007).........2, 9

*Hubbard v. 7-Eleven, Inc.*, 433 F. Supp. 2d 1134 (S.D. Cal. 2006) ...............................8

*Indep. Living Res. v. Oregon Arena Corp.*, 982 F. Supp. 698 (D. Or. 1997) .................7

*Mitchell v. Nat'l R.R Passenger Corp.*, 407 F. Supp. 2d 213 (D.D.C. 2005)...............16

*Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*, 950 F. Supp. 393 (D.D.C. 1996) ...................................................................................................15, 16

*Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627 (D.C. Cir. 2002)........................7

*Rome v. Lowenthal*, 428 A.2d 75 (Md. 1981)...............................................................15

*Russello v. United States*, 464 U.S. 16 (1983) ..............................................................14

*Sharp v. Rosa Mexicano, D.C., LLC*, 496 F. Supp. 2d 93 (D.D.C. 2007) ...............................5, 7, 8

*Smith v. City of Jackson*, 544 U.S. 228 (2005) ...........................................................................11

*Whitbeck v. Vital Signs, Inc.*, 934 F. Supp. 9 (D.D.C. 1996)........................................................16

**Statutes**

42 U.S.C. § 12112....................................................................................................................14

42 U.S.C. § 12113(a) ...............................................................................................................14

42 U.S.C. § 12182(a) ...............................................................................................................11

42 U.S.C. § 12182(b)(1)(A)......................................................................................................12

42 U.S.C. § 12182(b)(1)(A)(iii).................................................................................................12

42 U.S.C. § 12182(b)(2)(A)(ii)-(iv)...........................................................................................12

42 U.S.C. § 12182(b)(2)(A)(iv) .................................................................................................11

42 U.S.C. § 12182(b)(2)(D)…………………………………………………………………...12

42 U.S.C. § 12183(a) ...............................................................................................................12

42 U.S.C. § 12183(a)(1)............................................................................................................11

42 U.S.C. § 12183(a)(2)............................................................................................................11

42 U.S.C. § 12183(b) ...............................................................................................................12

42 U.S.C. § 12184(c) ...............................................................................................................12

42 U.S.C. § 12186(a)(2)............................................................................................................12

42 U.S.C. § 12186(d)(2)............................................................................................................12

42 U.S.C. § 2000e-2(a) .............................................................................................................14

**Regulations**

28 C.F.R. § 36.402-06...............................................................................................................12

28 C.F.R. Part 36.......................................................................................................................12

**State Statutes**

D.C. Code § 2-1401.03 ..........................................................................................................11, 14

D.C. Code § 2-1402.11(a) ................................................................................................ 14

D.C. Code § 2-1402.31(a) ................................................................................... 11, 14, 19

D.C. Code § 2-1402.68 ..................................................................................................... 11

D.C. Code § 2-1403.16 ..................................................................................................... 16

D.C. Mun. Regs. tit. 4 ...................................................................................................... 12

D.C. Mun. Regs. tit. 4, § 1002.1 ..................................................................................... 13

D.C. Mun. Regs. Tit. 4, § 513.1 ...................................................................................... 13

D.C. Mun. Regs. Tit. 4, § 513.5 ...................................................................................... 13

D.C. Mun. Regs. Tit. 4, § 513.11 .................................................................................... 13

## Other Authorities

2A Norman J. Singer, Sutherland's Statutes and Statutory Construction sec. 46.06
    (6th ed. 2000) ............................................................................................................ 14

District of Columbia Office of Human Rights Annual Reports, available at
    http://ohr.dc.gov/ohr/cwp/view.asp?a=3&q=630570&ohrNav=30953 .................... 17

**I.**
**INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiffs' own allegations in the complaint demonstrate that defendant has, time and again, diligently worked to rectify plaintiffs' concerns about wheelchair accessibility at its small business, the Circa at Dupont restaurant. Indeed, many of plaintiffs' concerns have already been resolved, and the remaining concerns are expected to be resolved shortly. Nonetheless, plaintiffs seek not only injunctive relief, which is, in large part, already moot, but also compensatory and punitive damages. The Americans with Disabilities Act ("ADA"), however, authorizes only injunctive relief and attorneys' fees, not compensatory or punitive damages. To accomplish what that Act does not permit, plaintiffs pursue a novel but unsupported theory under the District of Columbia Human Rights Act ("DCHRA"). This Court should reject plaintiffs' request that it intervene to the extent this is no longer a justiciable controversy, and it should likewise reject plaintiffs' attempt to circumvent the ADA's remedial scheme in order to obtain compensatory and punitive damages because plaintiffs' theory lacks any basis in the actual text of the DCHRA or its implementing regulations.

**II.**
**BACKGROUND**

Defendant MHG Café Dupont, LLC, operates the Circa at Dupont restaurant ("Circa"), which opened in the Spring of 2007. *See* Compl. ¶ 2. Prior to opening the restaurant, defendant made alterations to the site, which formerly housed a different restaurant, Wrapworks. *See id.*

¶¶ 2, 24.  As part of these alterations, defendant closed the street-level Connecticut Avenue N.W. entrance in favor of an entrance on Q Street N.W.  *See id.* ¶ 25.[1]

On July 17, 2007, plaintiff Fiedler contacted Stephen Gavula and Matthew Carlin, who serve as officers of defendant.  *See id.* ¶ 27.  Fiedler complained about the lack of a wheelchair accessible entrance.  *See id.*  The very next day, Carlin informed Fiedler that, in consultation with a patron who used a wheelchair, defendant had ordered and received an interim ramp to provide access to the restaurant.  *See* Email from M. Carlin to M. Fiedler, dated July 18, 2007, attached hereto as Exhibit A; Compl. ¶ 27.  The next week, on July 25, Carlin and Fiedler met to discuss Fiedler's concerns regarding the wheelchair access issue.  *See* Compl. ¶ 27.

Discussions with Fiedler continued both in person and by email.  On August 9, 2007, defendant emailed Fiedler a detailed proposal involving the interim ramp as well as interior and exterior automatic door openers.  *See id.* ¶ 30.  On September 26, 2007, Carlin stated:  "We are now focusing on creating a permanent entrance on Connecticut Avenue with an automatic push button.  We are meeting with our contractor and millwork company on Tuesday to discuss timing and pricing."  *See* Email from M. Carlin to M. Fiedler, dated September 26, 2007, attached hereto as Exhibit C; Complaint ¶ 32.  Fiedler replied on September 28, stating, among other

---

[1]  Defendant accepts the facts asserted in the Complaint as true for the purposes of this motion.  *See Green v. DOD Dependent Schools-Europe*, 514 F. Supp. 2d 79, 81 (D.D.C. 2007).  Defendant also properly references the correspondence between the parties, which is a central part of the Complaint.  *See id.* ("The Court may only consider the facts alleged in the complaint, any documents attached to the complaint as exhibits, and matters about which the Court may take judicial notice in addressing a Rule 12(b)(6) motion."); *see also GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

things:  "Thank you for updating me on the status of access improvements at Circa.  I'm pleased that you've decided to make the Connecticut Avenue entrance the accessible one.  As you know, that's what I view as the most sensible solution."  *See* Email from M. Fiedler to M. Carlin, dated September 28, 2007, attached hereto as Exhibit C; Complaint ¶ 32.  But defendant reported to Fiedler that it encountered difficulties with the Connecticut Avenue N.W. project.  *See* Compl. ¶ 33.  Carlin noted that, "[u]nfortunately, the process of changing the exterior casing on the Connecticut Avenue side to now add a full service door is turning out to be delayed longer than we originally anticipated."  Email from M. Carlin to M. Fiedler on November 9, 2007, attached hereto as Exhibit D.  Carlin went on to note that Circa was planning to obtain an adjoining space and use the entrance that was a part of that space, "subject to permit approval by the City."  *Id.*  Carlin also described Circa's interim solution:  "We continue to put the movable ramp in place when a handicapped person wishes to enter.  We have had numerous opportunities to use this ramp to date and as you know we were given this ramp suggestion by a handicapped member of our community.  We recognize this does not meet your desires, but it is all we are prepared to offer at this time."  *Id.*  Work is ongoing to implement a permanent solution involving a new door at the Connecticut Avenue entrance to the restaurant; defendant has already had plans drawn up and has had a door made, and is in the process of seeking the necessary approvals for the door.  *See* Declaration of Stephen Gavula ("Gavula Decl."), dated March 24, 2008, ¶ 9.

Defendant has also addressed Fiedler's other concerns.  It removed movable furniture in the restaurant's restrooms to enable a full wheelchair turning radius.  *See* Compl. ¶ 43.  In addition, defendant installed hardware and unlocked the Connecticut Avenue, N.W. entrance, as suggested by Fiedler.  *See* Compl. ¶ 40; Email from M. Fiedler to M. Carlin, dated July 26, 2007, attached hereto as Exhibit A.  Interior furniture blocking these doors has been removed.  *See*

Gavula Decl. ¶ 9.  Defendant also changed its hours of service so that wait service is available during all business hours.  *See id.* ¶ 2.  Further, defendant has provided a wheelchair accessible table, seating six patrons, in the interior of the restaurant as well as a wheelchair accessible table, seating two people, in the exterior seating space of the restaurant.  *See id.* ¶¶ 4-5.  Finally, defendant is in the process of obtaining an accessible counter and gate access to the exterior seating area.  *See id.* ¶¶ 6-7.

Plaintiffs filed their complaint on February 11, 2008.  Count I alleges violations of the ADA, which authorizes injunctive relief and attorney's fees.  As discussed in Section III.A below, many of the substantive allegations are moot inasmuch as they have already been remedied, and the remainder will be moot soon because they are in the process of being remedied; accordingly, no injunctive relief is necessary.  Count II relies on the same factual assertions to allege violations of the DCHRA as a means of seeking compensatory and punitive damages, which are not authorized by the ADA.  It should be dismissed not only for mootness, *see* Section III.A below, but also for failure to state a cognizable cause of action under the DCHRA.  *See* Section III.B below.

**III.**
**ARGUMENT**

**A.    THREE OF PLAINTIFFS' SIX CLAIMS ARE NOW MOOT DUE TO DEFENDANT'S VOLUNTARY REMEDIATION EFFORTS.**

Plaintiffs' complaint alleges six separate violations of the ADA:

1.    "[A] lack of accessible tables that wheelchair users could access or utilize" (Compl. ¶ 35(a)):  Accessible tables have now been installed.  *See* Gavula Decl. ¶¶ 4-5.[2]

2.    "[A] service and ordering counter that exceeded the maximum height allowance" (Compl. ¶ 35(b)):  A contractor has been hired to remove the bakery case at Circa and install a new counter.  Part of the new counter will include a retractable shelf that is designed to be at least 36 inches wide and approximately 36 inches off the ground.  The new bar is currently scheduled to be installed on April 3, 2008.  *See* Gavula Decl. ¶ 7.

3.    "[R]estrooms in which the requisite wheelchair turning space had been obstructed by the placement of furniture" (Compl. ¶ 35(c)):  As acknowledged in the Complaint, the allegedly obstructing furniture has been moved.  *See* Compl. ¶ 43; Gavula Decl. ¶ 3.

---

[2]    The Court is entitled to review evidence such as the Gavula Decl. in evaluating this motion under Rule 12(b)(1).  *See Sharp v. Rosa Mexicano, D.C., LLC*, 496 F. Supp. 2d 93, 99 n.6 (D.D.C. 2007).

4.        "[A]n outdoor eating area that was inaccessible to wheelchair users due to a step at its entrance from the restaurant . . . and a narrow gate that prevented access at its entrance from Q Street" (Compl. ¶ 35(d)):  The narrow gate has been removed and there is now a space in the railing for a new, wider gate.  The new, wider gate is expected to be installed by mid-April.  *See* Gavula Decl. ¶ 6.

5.        "[D]uring breakfast hours, there was no wait service, and orders had to be placed, paid for, and received by customers at the inaccessible service and ordering counter" (Compl. ¶ 36):  Wait service is now available during all hours in which the restaurant is open.  *See* Gavula Decl. ¶ 2.

6.        "[N]o accessible entrance to Circa at Dupont" (Compl. ¶ 35):  The current Connecticut Avenue entrance, which consists of two French doors, has had handles installed and those doors are open during all business hours.  *See* Gavula Decl. ¶ 9.  In addition, plans have been drawn up for a permanent door at the Connecticut Avenue entrance.  *Id.*  That door has already been built and Circa is in the process of applying for the necessary permits to have that door installed.  *Id.*

Under Rule 12(b)(1), the Court must dismiss that portion of the case that relies on paragraphs 35(a), 35(c) and 36 of the Complaint (set forth at 1, 3 and 5 above) because there is no justiciable case or controversy—those claims are moot.  The doctrine of mootness limits the subject matter jurisdiction of the court "when 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting

6

them in the future.'"  *Sharp,* 496 F. Supp. 2d at 97-98 (citing *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002)).  In particular, plaintiffs seek injunctive relief under the ADA for alleged violations that have already been remedied.  "Because under the ADA only injunctive relief may be granted to a private party . . . once a plaintiff has received everything the court would order, the federal claims are moot.  Thus, generally, a defendant's successful remedial efforts will render a plaintiff's ADA suit subject to dismissal as moot."  *Eiden v. Home Depot USA, Inc.*, No. Civ. S-04-977, 2006 U.S. Dist. LEXIS 38423, *31 (E.D. Cal. May 26, 2006) (citation omitted);  *Indep. Living Res. v. Oregon Arena Corp.*, 982 F. Supp. 698, 771 (D. Or. 1997) ("If plaintiffs already have received everything to which they would be entitled, *i.e.*, the challenged conditions have been remedied, then these particular claims are moot absent any basis for concluding that these plaintiffs will again be subjected to the same alleged wrongful conduct by this defendant." (citations omitted)).[3]

When a defendant has addressed the plaintiff's claims through voluntary action, it must show that violations cannot be reasonably expected to return, and that the effects of the alleged violations have been "completely and irrevocably eradicated."  *See Sharp*, 496 F. Supp. 2d at 99 (citation and quotation omitted).  Accessible tables have been installed, furniture has been moved, and the restaurant's hours of operation have been altered so that wait service is available

---

[3]   *See also Sharp*, 496 F. Supp. 2d at 98 ("Where only injunctive or declaratory relief is requested, and events have so transpired that the controversy has ended and there is no remedy for the court to impose, a controversy is moot unless one of the exceptions to mootness applies.").  Here, plaintiffs also seek compensatory and punitive damages as well as their costs and attorneys' fees.  *See* Compl. at 16-17 ("Prayer for Relief").  As discussed in Section III.B.1 below, however, compensatory and punitive damages are unavailable here.  Moreover, attorneys' fees are unavailable in cases like this one where judicial intervention is not required to achieve compliance.  *See Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health and Human Res.*, 532 U.S. 598, 605, 610 (2001); *Sharp*, 496 F. Supp. 2d at 100.

at all times when the restaurant is open for business.  *See* Gavula Decl. ¶¶ 2-5.  These substantial

changes to the restaurant make it unreasonable to expect that the alleged violations will return.

They also cure the effects purportedly caused by the alleged former conditions.  Therefore,

dismissal on mootness grounds is required.  *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl.*

*Servs.*, 528 U.S. 167, 190 (2000) (holding that a claim for injunctive relief is moot if "it is

absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur");

*Sharp*, 496 F. Supp. 2d at 99 ("The alleged discrimination cannot reasonably be expected to

recur because 'structural modifications . . . are unlikely to be altered in the future.'" (citations

omitted)).

In considering the effect of a defendant's voluntary remedial actions, courts have

determined mootness on a barrier-by-barrier basis.  *See, e.g., Eiden*, 2006 U.S. Dist. LEXIS

38423, at *31-32 (dismissing ADA claims for five of thirteen barriers alleged in the complaint);

*Hubbard v. 7-Eleven, Inc.*, 433 F. Supp. 2d 1134, 1145-48 (S.D. Cal. 2006) (considering

mootness of each alleged barrier separately and noting that "because the evidence before the

Court shows Defendant has remedied the violation in accordance with [plaintiffs' expert's]

recommendation, the issue is moot" (citations omitted)).  Accordingly, it is appropriate here to

dismiss immediately as moot those claims founded on alleged defects that have already been

remedied and are, therefore, not subject to judicial resolution.[4]

---

[4] Defendant expects remedial action on the remaining alleged violations to be completed
shortly, *see* Gavula Decl. ¶¶ 6-9, and anticipates seeking dismissal or summary judgment
of those remaining claims at that time.

**B.    PLAINTIFFS' DCHRA CLAIMS SHOULD BE DISMISSED BECAUSE THE ALLEGATIONS OF ADA VIOLATIONS ARE NOT SUFFICIENT PREDICATES FOR THE DCHRA CLAIMS.**

Plaintiffs seek to avoid the mootness of their claims by adding a second count to the Complaint based on the District of Columbia Human Rights Act. *See, e.g.*, Compl. at 16 (First Prayer For Relief: "Declare Defendant's restaurant in violation of the ADA and DCHRA to the extent that it does not comply with the ADA and its implementing regulations and standards[.]"). Plaintiffs assert that the same six alleged defects that purportedly violate the ADA also constitute violations of the DCHRA. *See id.* ¶¶ 35-37, 69-79. This Court should reject plaintiffs' attempt to end-run the ADA remedial scheme, however, because plaintiffs fail to state a claim upon which relief can be granted under the DCHRA.

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must determine whether the plaintiffs have pleaded "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). Such a pleading must "nudge[] [plaintiffs'] claims across the line from conceivable to plausible." *Id.* In making its determination, the Court may properly consider "facts alleged in the complaint, any documents attached to the complaint as exhibits, and matters about which [it] may take judicial notice in addressing a Rule 12(b)(6) motion." *Green*, 514 F. Supp. 2d at 81. Appropriate documents include central items that the plaintiffs referred to in the Complaint. *See GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). Absent a showing of plausibility by the plaintiffs, the Court must dismiss the Complaint. *See Twombly*, 127 S. Ct. at 1974. Here, the allegations of the Complaint fail to cross this threshold with respect to the DCHRA.

1.    **THE DCHRA DOES NOT REQUIRE THE SAME AFFIRMATIVE STEPS AS THE ADA.**

The DCHRA "is different from the federal statutes in . . . significant ways." *East v. Graphic Arts Indus. Joint Pension Trust*, 718 A.2d 153, 159 (D.C. 1998). A comparison of Title III of the ADA to the public accommodations provision of the DCHRA leads to the inescapable conclusion that these two statutes are not comparable. While the ADA public accommodation provisions require specific affirmative acts to ensure accessibility for disabled individuals, the DCHRA public accommodation provisions are more akin to the traditional anti-discrimination statutes, which prohibit acts of discrimination but do not require additional measures above and beyond equal treatment without regard to the protected characteristic. As a result, bare allegations of Title III ADA violations cannot state a claim for relief under the DCHRA.

The DCHRA and Title III of the ADA adopt significantly different regimes with respect to disability discrimination in public accommodations. The DCHRA provision states only that:

> It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based on the actual or perceived:  race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, genetic information, *disability*, matriculation, political affiliation, source of income, or place of residence or business of any individual:
>
> (1) To deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations[.]

D.C. Code § 2-1402.31(a) (emphasis added).[5] The DCHRA contains no additional explanation of this provision, and the District of Columbia has not promulgated any regulations setting forth any additional requirements. Thus, to establish a violation of this provision, plaintiffs would have to show that defendant, wholly or partially for a discriminatory reason based on plaintiffs' disability, denied plaintiffs the full and equal enjoyment of its restaurant. As set forth below, the pleadings fail to establish that such claims are plausible, and they are therefore subject to dismissal under *Twombley*.

In contrast to the DCHRA, Title III of the ADA contains not only a non-discrimination provision, *see* 42 U.S.C. § 12182(a), but also specific affirmative requirements for providing accommodations to the disabled in public facilities. Title III of the ADA requires the removal of architectural barriers and structural communications barriers when such removal would be "readily achievable." *Id.* § 12182(b)(2)(A)(iv). In addition to the existing facilities standard, the ADA also contains a different, detailed standard for new construction, requiring such facilities to be "readily accessible" except when "structurally impracticable." *Id.* § 12183(a)(1). The ADA sets yet another standard for facilities that have undergone alteration, requiring alterations to be "readily accessible to" disabled individuals, "including individuals who use wheelchairs." *Id.* § 12183(a)(2). Alterations must be accessible "to the maximum extent feasible." *Id.* The DCHRA includes none of these additional, affirmative obligations.

---

[5] The DCHRA also states that "[a]ny practice which has the effect or consequence of violating any of the provisions of [the DCHRA] shall be deemed to be an unlawful discriminatory practice." D.C. Code § 2-1402.68. The DCHRA excludes from this prohibition practices with such an effect when they are "not intentionally devised . . . and can be justified by business necessity." D.C. Code § 2-1401.03(a). These clauses incorporate the familiar concept of disparate impact discrimination. *See Smith v. City of Jackson*, 544 U.S. 228, 233 (2005).

The ADA also specifies that public accommodations cannot offer disabled individuals accommodations that are "different or separate from that provided to other individuals" unless separate accommodations are necessary and "as effective" as that provided to other patrons. 42 U.S.C. § 12182(b)(1)(A)(iii). Title III also contains provisions specifically related to elevators, 42 U.S.C. § 12183(b), over-the-road buses, *id.* §§ 12182(b)(2)(D) and 12186(a)(2), historical or antiquated cars, *id.* § 12184(c), and rail cars, *id.* § 12186(d)(2). These provisions, or provisions of a similar nature, cannot be found in the DCHRA.

The ADA's affirmative obligations with respect to public accommodations are enumerated in even more detail in its comprehensive regulatory scheme, found at 28 C.F.R. Part 36 & Appendix A. The ADA's public accommodations regulations include no fewer than five sections on alterations alone. *See* 28 C.F.R. §§ 36.402-06. The comprehensive ADA scheme further includes the Standards for Accessible Design, which contains intricate rules on matters ranging from the required number of accessible telephones to the slope of wheelchair ramps to the maximum force needed to open doors. *See* 28 C.F.R. Part 36 at Appendix A. Defendant has been unable to locate any discernable public accommodations regulations for the DCHRA public accommodations provisions, let alone a regulatory regime with the heft and complexity of Title III's scheme. *See* D.C. Mun. Regs. tit. 4.

In sum, the respective DCHRA and ADA public accommodations provisions stand in sharp relief. The ADA provides a detailed scheme for the identification of discrimination depending on the age of the building or the time of alteration, the provision of different or separate goods, services, and accommodations, and an exception for the modification of policies, practices, and procedures when they would "fundamentally alter" the nature of the goods or accommodations. 42 U.S.C. §§ 12182(b)(1)(A), 12182(b)(2)(A)(ii)-(iv), 12183(a). The

DCHRA's general provision addresses none of these issues. The ADA goes beyond statutory language to provide a comprehensive regulatory regime related to public accommodations. But the DCHRA public accommodations provisions are not supported by any regulations, despite the District of Columbia's action to provide demanding regulations in other DCHRA contexts, as discussed below. In light of these considerable differences, these statutes cannot be considered "comparable." Thus, plaintiffs should be bound to the plain text of the DCHRA without reference to incomparable standards borrowed from the ADA.

The conclusion that the DCHRA does not require the same kind of affirmative measures in public accommodations as the ADA is underscored by a comparison of the public accommodations provisions of the DCHRA with the DCHRA's sections addressing real estate and employment. In these latter two areas, the DCHRA not only prohibits discrimination but also requires affirmative measures to assist disabled individuals. The DCHRA real estate regulations, for example, require landlords to permit reasonable modifications by disabled tenants. *See* D.C. Mun. Regs. tit. 4, § 1002.1. Similarly, the DCHRA employment regulations adopt a regulatory scheme that specifies affirmative actions that employers must take to accommodate disabled employees and expressly incorporates related federal regulations. *See id.* §§ 513.1, 513.5, 513.11. This sophisticated regulatory scheme indicates that, when the District of Columbia desired to support the DCHRA with detailed regulations that require affirmative action and incorporate federal law, it did so. It pointedly did not do so in the public accommodations context. This distinction between the real estate and employment portions of the DCHRA and its regulations, on the one hand, and the public accommodations provisions, on the other, leads to the conclusion that similar affirmative obligations were expressly excluded from the public accommodations provisions. *See Am. Fed. of Labor & Cong. of Indus. Orgs. v.*

*Fed. Election Comm'n*, 333 F.3d 168, 181 (D.C. Cir. 2003) (Henderson, J., concurring) (citing

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[W]hen Congress includes particular

language in one section of a statute but omits it in another section . . ., it is generally presumed

that Congress acts intentionally and purposely in the disparate inclusion or exclusion."

(quotations omitted)); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from

concluding . . . that the differing language in the two subsections has the same meaning in

each."); 2A Norman J. Singer, Sutherland's Statutes and Statutory Construction sec. 46.06, at

194 (6th ed. 2000) ("When the legislature uses certain language in one part of the statute and

different language in another, the court assumes different meanings were intended.")).[6]

The analysis of these employment provisions indicates that, when the D.C. Council

wanted to track federal civil rights schemes, it knew how to adopt the relevant detailed and

---

[6]  The DCHRA and Title I of the ADA contain comparable provisions related to
employment discrimination on the basis of disability.  Both statutes contain detailed
prohibitions concerning discriminatory hiring, advancement, discharge, compensation,
and training of employees on the basis of disability.  *Compare* 42 U.S.C. § 12112(a)-(b)
*with* D.C. Code § 2-1402.11(a).  Furthermore, the DCHRA's "business necessity" and
"bona fide occupational requirement" exceptions closely mirror the exceptions for
"business necessity" and "job-related" tests and standards in Title I of the ADA.
*Compare* 42 U.S.C. § 12113(a) *with* D.C. Code § 2-1401.03(a), (e).  These detailed
employment provisions of the DCHRA are comparable to provisions in Title I of the
ADA, and they further highlight the difference of substance, detail, and depth between
the District of Columbia and federal public accommodations provisions.

In addition, compared with the dearth of authority on public accommodations, District of
Columbia courts have often applied the comparable and persuasive federal precedent
when analyzing employment discrimination claims under the DCHRA.  *See, e.g., Grant
v. May Dep't Stores Co.*, 786 A.2d 580, 583-84 (D.C. 2001) (citing cases).  Because the
statutory language is similar, *compare* 42 U.S.C. § 2000e-2(a)-(d) *with* D.C. Code § 2-
1402.11(a), courts have found aspects of the federal and District of Columbia provisions
comparable.  *See Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361 n.17 (D.C.
1993).  But the close tracking of the employment provisions further highlights the
disparity between the public accommodations provisions in Title III of the ADA and § 2-
1402.31(a) of the DCHRA.

specific language of the applicable federal statute.  The failure of the DCHRA to provide a similar statutory scheme to Title III of the ADA shows that the Court should not look to the ADA for determination of a violation in the public accommodations context.  This reading of the public accommodation provision of the DCHRA comports with the statute's construction as a whole, reflecting provisions that were excluded as well as included.  *See Cook v. Edgewood Mgmt. Corp.*, 825 A.2d 939, 946 (D.C. 2003) ("'Statutory interpretation is a holistic endeavor, and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter.'") (citation omitted); *Rome v. Lowenthal*, 428 A.2d 75, 79 (Md. 1981) ("In construing the statute here in question we are obliged . . . to ascertain and carry out the real legislative intent; to consider the language of the enactment in its natural and ordinary signification; to not insert or omit words to make a statute express an intention not evidenced in its original form; and, if reasonably possible, absent a clear indication to the contrary, to read the statute so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory.").

Although this Court has briefly considered this issue once before, that case is inapposite. In *Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*, 950 F. Supp. 393, 405 (D.D.C. 1996), the Court summarily concluded, after a few sentences, that the DCHRA "is applied in the same manner as the parallel federal antidiscrimination provisions" of the ADA. The Court reached this conclusion, however, without a comparison of the respective public accommodations provisions of the DCHRA and the ADA.  *See id.*  In fact, defendant has not found a single case analyzing whether the respective public accommodation provisions in the DCHRA and the ADA should be considered "comparable."  Furthermore, the primary authority cited in *Paralyzed Veterans* involved an employment discrimination claim rather than a public

accommodations claim.  *See Whitbeck v. Vital Signs, Inc.*, 934 F. Supp. 9, 13 (D.D.C. 1996).  As noted above, the employment discrimination provisions of the DCHRA and federal law are generally comparable.  Moreover, the relief requested in *Paralyzed Veterans* also gave the Court no reason to consider closely the various distinctions between the DCHRA and Title III of the ADA.  The plaintiff in *Paralyzed Veterans* sought only injunctive relief.  *See Paralyzed Veterans*, 950 F. Supp. at 405-06.  Therefore, the application of the DCHRA was superfluous because a violation of the ADA provided the plaintiff with all the relief it required.  In this case, however, plaintiffs seek injunctive relief for their ADA claim, coupled with compensatory and punitive damages in their DCHRA claim.  *See* Compl. ¶¶ 68, 79.  The only way for plaintiffs to obtain compensatory or punitive damages is to state a claim under the DCHRA, which allows for both remedies.  D.C. Code § 2-1403.16.

The analysis above demonstrates that the DCHRA and Title III of the ADA cannot be considered comparable.  Only "comparable" federal civil rights precedent is "persuasive" in construing sections of the DCHRA.  *Chang v. Inst. for Public-Private P'ships, Inc.*, 846 A.2d 318, 324 (D.C. 2004); *Grant*, 786 A.2d at 583-84.  Federal civil rights precedent should not be adopted in DCHRA cases "indiscriminately."  *Mitchell v. Nat'l R.R. Passenger Corp.*, 407 F. Supp. 2d 213, 240 (D.D.C. 2005).  Therefore, the determination that ADA standards dictate the outcome of the DCHRA claims in *Paralyzed Veterans* should not be considered controlling in this case.[7]

---

[7]    Indeed, the DCHRA public accommodations provision is accompanied by a distinct lack of published precedent.  In an attempt to locate relevant decisions, counsel for defendant even met with examiners at the District of Columbia Human Rights Commission.  However, they were unable to produce a single reported decision involving discrimination in public accommodations on the basis of disability.  The Commission's

[Footnote continued on next page]

Because the District of Columbia and federal statutes are not comparable, plaintiffs may not rely on the definition of discrimination from the ADA public accommodations provisions and the associated regulatory scheme and precedent. Therefore, plaintiffs cannot merely point to their ADA allegations to establish sufficient predicates for their DCHRA claims.

### 2. PLAINTIFFS FAIL TO STATE A CLAIM FOR UNLAWFUL DISCRIMINATION UNDER THE DCHRA.

To support their claims for compensatory and punitive damages under the DCHRA, plaintiffs must rely on the definition of unlawful discrimination from the DCHRA without reference to the ADA or its regulations. Based on the plain statutory language of the DCHRA, plaintiffs must plead enough facts to show the plausibility of (1) a denial of the full and equal enjoyment of a place of public accommodation that was (2) done wholly or partially for a discriminatory reason based on actual or perceived disability. *See* D.C. Code § 2-1402.31(a). In this case, plaintiffs have not pleaded and they cannot prove the presence of either element.

The current accessibility solutions indicate that defendant is not "deny[ing], directly or indirectly, any person the full and equal enjoyment" of the restaurant. D.C. Code § 2-1402.31(a)(1). The Complaint is replete with defendant's efforts to respond to the concerns expressed by patrons using wheelchairs. As the Complaint admits, upon learning of an accessibility issue at the entrance, defendant immediately obtained a portable ramp that has been used by disabled patrons. *See* Compl. ¶ 27. In addition, defendant has made additional efforts to implement a more permanent solution to the entrance issue and has made a number of additional

---

[Footnote continued from previous page]
available published Annual Reports for the years 2004 and 2006 similarly indicate no reported decisions in this context. *See* District of Columbia Office of Human Rights Annual Reports, available at http://ohr.dc.gov/ohr/cwp/view.asp?a=3&q=630570&ohrNav=30953 (last visited March 24, 2008). To the best of defendant's knowledge, the Commission has not published Annual Reports for other years on its website.

changes to the restaurant.  *See id.* ¶¶ 28-30, 43.  It simply cannot be the case that a denial of the full and equal enjoyment occurs when a number of disabled individuals have used the accommodations provided and have indeed gained access to the restaurant.  Nowhere do plaintiffs allege in their DCHRA claim that wheelchair-bound individuals, *as a group*, have been denied access, only that Fiedler found the portable ramp solution unacceptable.  According to the Complaint, Fiedler's objections to the portable ramp were based solely on its alleged deficiencies vis-à-vis ADA standards.  *See* Compl. ¶¶ 30, 34.  As explained in Part III.B.1, however, a violation of Title III of the ADA does not state a claim under the DCHRA.  Defendant has also made other changes including offering full wait service during all business hours, accessible restrooms, and accessible tables.  *See* Gavula Decl. ¶¶ 2-5.  Defendant has made significant efforts to provide patrons in wheelchairs with the restaurant's full services.

The presence of discriminatory intent is also fatally undercut, for three reasons.  First, as set forth in the Complaint, defendant has repeatedly sought to accommodate Fiedler and other patrons using wheelchairs.  *See* Compl. ¶¶ 28, 33, 40, 43.  Defendant's good faith can be seen in its ongoing communications with Fiedler as it sought to reach a solution that would be acceptable to him.  Defendant continued to make efforts to provide a long-term solution to plaintiff's accessibility concerns while making available the portable ramp that a number of other disabled patrons had used to obtain access to the restaurant.  *See* Exh. D (November 9 Email).  Overall good faith can be seen in the modifications that have already occurred, including the provision of accessible restrooms, which plaintiffs acknowledge.  *See* Compl. ¶ 43.  As noted above, defendant has also provided full wait service during all business hours and installed accessible tables in both interior and exterior seating areas.  *See* Gavula Decl. ¶¶ 2-5.

Defendant's response, as well as the effort and expenditures associated therewith, render any inference of discriminatory intent implausible.

Second, as set forth in the Complaint and attached documents, defendant has provided a temporary solution to the wheelchair accessibility issue in the form of an interim ramp that can be installed upon request. *See* Compl. ¶¶ 28, 30, 33. This ramp was recommended by another disabled patron, *see* Exh. A (July 18 email). This effort to provide access seriously undercuts the plausibility of any inference of discriminatory motivation. To the contrary, it indicates that, once alerted of a concern, defendant acted to provide wheelchair access as soon as reasonably possible. Defendant's actions involving the interim ramp also show its good faith attempt to provide an accessible restaurant for the enjoyment of all patrons.

Third, plaintiffs have not even alleged any "discriminatory reason." Instead, plaintiffs rely on the inapplicable ADA standard. This is insufficient.

The Court should dismiss plaintiffs' DCHRA claims because plaintiffs have failed to plead facts to support a plausible claim that defendant denied disabled patrons full and equal enjoyment of its restaurant with a discriminatory reason pursuant to D.C. Code § 2-1402.31(a).

## CONCLUSION

This case does not involve invidious discrimination based on disability. It does not involve a willful or malicious actor. What this case does involve is a restaurateur who took action to rectify a customer's complaints about wheelchair accessibility. This restaurateur continues to transform its operations through a combination of permanent and interim measures to serve all customers. In addition, this restaurateur continues to work toward permanent accessibility solutions at considerable effort and expense. Put simply, this case does not allege the type of conduct that the DCHRA was designed to remedy.

Accordingly, defendant respectfully requests that the Court dismiss plaintiffs' DCHRA claims for failure to state a claim upon which relief can be granted. Defendant further requests that the Court dismiss plaintiffs' claims concerning the already-rectified ADA violations on the grounds of mootness.

Respectfully submitted,

Dated: March 24, 2008

F. JOSEPH WARIN, D.C. Bar No. 235978
JASON C. SCHWARTZ, D.C. Bar No. 465837
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue N.W.
Washington, District of Columbia 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

Attorneys for MHG CAFÉ DUPONT, LLC,

20

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Marc Fiedler, *et al.*,

          Plaintiffs,

      v.                             Civil Action No. 1:08CV00225 (PLF)

MHG Café Dupont, LLC,

          Defendant.

## CERTIFICATE OF SERVICE

    I hereby certify that on this 24th Day of March, 2008, I caused to be served a copy of the foregoing Defendant's Partial Motion to Dismiss Plaintiffs' Complaint or to Strike Certain Allegations via the Court's electronic filing system upon the following :

        Alan Swirski
        1440 New York Ave., NW
        Washington, DC 20005

        Elizabeth Elaine Garner
        Washington Lawyers' Committee for Civil Rights
        11 Dupont Circle, NW, Suite 400
        Washington, DC 20036

                        _____
                      Jason C. Schwartz

**EXHIBIT A**

**From:** "Marc Fiedler" <mfiedler@starpower.net>
**To:** <mcarlin@mhggroup.com>
**CC:**
**Subject:** Re: Circa at Dupont
**Date:** Saturday, August 04, 2007 2:25:56 PM

Matt,

Could you please email to me your proposed solution so perhaps we could discuss it by phone? That will save me a great deal of time and effort. I'm available Tuesday, Wednesday and Friday afternoons. Thank you

Marc

----- Original Message -----
**From:** mcarlin@mhggroup.com
**To:** Marc Fiedler ; Kimoy C. Lallement
**Cc:** Tony DePaul
**Sent:** Friday, August 03, 2007 11:59 AM
**Subject:** Re: Circa at Dupont

Marc,
I met with our architects and general contractor this week and was wondering if you would be available sometime next week to review and discuss our proposed solution?
I would appreciate your input.
Thanks,
Matt

----- Original Message -----
**From:** "Marc Fiedler"
**To:** mcarlin@mhggroup.com
**Subject:** Re: Circa at Dupont
**Date:** Thu, 26 Jul 2007 21:55:14 -0400

Matt,

It was a pleasure meeting you yesterday at Circa to discuss the wheelchair-access issue.

Here's why the information you were given -- to the effect that it's sufficient merely to install an accessible entrance even if it's not readily available for use (e.g., locked and blocked by furniture) -- is incorrect. The U.S. Department of Justice's American's with Disabilities Act Title III Technical Assistance Manual (available at http://www.ada.gov/taman3.html#III-3.7000) says: "Where a public accommodation must provide an accessible route, the route must remain accessible and not blocked by obstacles such as furniture, filing cabinets, or potted plants. Similarly, accessible doors must be unlocked when the place of public accommodation is open for business."

I still believe the best and probably easiest solution is to make the Connecticut Avenue door your main entrance. From the perspective of a person with a disability, a level entrance is almost invariably preferable to a ramped one. Ramps can be difficult or dangerous to negotiate in rainy, snowy, or icy weather. Even in good weather, they can be hard to use for people with braces, crutches, canes, or walkers. A level entrance is also safer for ambulatory customers -- no step to trip over

The alternative you seem to prefer -- ramping the Q Street entrance -- is more problematic, probably more expensive, and ultimately less satisfactory. As we discussed, the manhole cover in front of that entrance may well preclude installation of a ramp that complies with D C and federal accessibility

standards. Even if you theoretically could install a complying ramp, you'd probably need to obtain special permits, such as for building a structure on a public sidewalk and perhaps from the historic-preservation authorities, too. And for the reasons previously mentioned, a ramped entrance would be less desirable than a level one.

Whatever alternative you choose, it must be implemented right away. Now, without an accessible entrance, Circa violates the law and discriminates against people with disabilities. That may not be your intent, but it's the unmistakable effect. You say you simply wish to serve the community, but you must realize that people with disabilities are part of the community too, and failure to serve us like you do others is not only unconscionable but also unlawful.

So once again I ask you: Will you rectify this problem? How? When? Until you implement a permanent solution, please open up the Connecticut Avenue entrance so people with disabilities will have an accessible way to enter and exit your restaurant. Will you do that? Kindly respond promptly and with specificity.

Thank you.

Marc Fiedler

---- Original Message -----
From: mcarlin@mhggroup.com
To: Marc Fiedler ; sgavula@mhggroup.com
Sent: Wednesday, July 18, 2007 9:38 AM
Subject: Re: Circa at Dupont

Dear Mr. Fiedler,
Thank you for your email and I was made aware of your unfortunate and unacceptable experience over the weekend by my management team. I have been working with a very kind and helpful woman from the neighborhood who also uses a wheelchair, Nancy Blasdel, and she recommended a wheelchair ramp for the front door that I have ordered and just received. It will hopefully be installed today (Wed) and would appreciate your opinion on the matter very much. Please email me or call me on my cell if you would like or, better yet, we could meet at Circa if you are available to see if this is an acceptable solution.
Sincerely,
Matt Carlin
703-629-4352

----- Original Message -----
From: "Marc Fiedler"
To: sgavula@mhggroup.com, mcarlin@mhggroup.com
Subject: Circa at Dupont
Date: Tue, 17 Jul 2007 21:08:47 -0400

Messrs. Gavula and Carlin,

This concerns the accessibility of Circa at Dupont to people with disabilities . . . or, rather, the lack of accessibility.

This past Saturday, at about 4:30 pm, I went to the restaurant, which I recently read about. The only open entrance was on Q Street. It had one step and a sign reading "Watch Your Step."

I couldn't help but watch the step. I use a wheelchair.

While sitting outside the entrance, I asked the manager to show me the wheelchair-accessible entrance. He said the entrance on Conn. Ave. is accessible, they decided to open the Q Street entrance instead, but they'd open the Connecticut Avenue entrance for me.

Federal and local civil-rights laws require the main entrance of businesses like yours to be open and readily available for use by all customers, including those who have a disability. That requirement isn't met where a customer with a disability must request that an accessible-but-closed entrance be opened. The business effectively foists onto that customer a humiliating burden that other customers needn't bear. It's unfair, discriminatory, and unlawful.

The entrance to the restaurant that previously occupied that space was on Connecticut Avenue and was easy to use by everyone. Customers didn't have to watch their step.

Will you rectify the problem I encountered? How? When?

I look forward to your prompt and specific response. Thank you.

Marc Fiedler


Matthew Carlin
CFO and COO
The MHG Group of Companies
6839 Redmond Drive
McLean, VA  22101
(cell) 703-629-4352
(fax) 703-821-3473


Matthew Carlin
CFO and COO
The MHG Group of Companies
6839 Redmond Drive
McLean, VA  22101
(cell) 703-629-4352
(fax) 703-821-3473

**EXHIBIT B**

**From:** "Marc Fiedler" <mfiedler@starpower.net>
**To:** <mcarlin@mhggroup.com>
**CC:**
**Subject:** Re: Re: Circa at Dupont
**Date:** Thursday, August 09, 2007 4:30:13 PM

Matt,

Thank you for forwarding your proposed solution to the wheelchair-access problem at Circa. Upon review of the materials you emailed to me, here are my questions:

1. With the ramp and platforms on casters, what will prevent them from shifting and separating, creating gaps?
2. What is the slope of the ramp?
3. What is the surface treatment of the ramp?
4. What is the edge protection of the ramp?
5. What is the edge protection of the platforms?
6. Will the bench on the platform interfere with a wheelchair's maneuvering clearance or turning radius (as appears from the drawing)?
7. For a person in a wheelchair approaching the door from the outside, will the door open automatically before the person reaches the platform (i.e., before the person inadvertently gets in the way of the door's swing path)?
8. When will the ramp, platforms, and door opener be installed?
9. How will you provide access for people with disabilities till then?

I look forward to your response

Marc Fiedler

—— Original Message —–
**From:** mcarlin@mhggroup.com
**To:** mfiedler@starpower.net
**Sent:** Thursday, August 09, 2007 11:01 AM
**Subject:** Fw: Re: Circa at Dupont

Marc,
Attached is the proposed solution that has been refined slightly since the email to include interior and exterior automated door openers. We were unable to create a solution moving the front door to Conn. Ave for a number of reasons. Pepco is thankfully fine with it and we will need to work with DC Public Space for the ramp but after my explanation of why we are doing this they did not foresee any obstacles. I'm actually going to the beach with my family late tomorrow or early Sat for a week but would very much appreciate your input and thoughts. Thanks, Matt

Circa Team,

For your initial review, please find the attached for the ramp option we discussed.

- There would be two (2) abutting platforms and one (1) ramp, each with casters on one side to be easily rolled away for PEPCO access. (**Joe**, do we need PEPCO permission to do this?)
- The door would need to be made automated Â– see attached hardware (#4640) for a top jamb operator. The least obtrusive actuator would be the Motion Sensor. It should be noted that we do NOT have the 12Â" clearance required on the PUSH side of the door Â– **Joe**, could you please confirm

whether having an automated door releases that requirement?

**This is all food for thought.**
**Regards,**

**Kimoy C. Lallement** _____
**Adamstein & Demetriou | Architecture & Design**
3247 Q Street, NW    Second Floor       Washington, DC 20007
202.333.9038                            202.333.8889 (f)
www.ad-architects.com                   kimoy.@ad-architects.com

**Matthew** Carlin
CFO and COO
The MHG Group of Companies
6839 Redmond Drive
McLean, VA  22101
 cell) 703-629-4352
(fax) 703-821-3473

**EXHIBIT C**

**From:** "Marc Fiedler" <mfiedler@starpower.net>
**To:** <mcarlin@mhggroup.com>
**CC:** <sgavula@mhggroup.com>
**Subject:** Re: Circa at Dupont-follow up
**Date:** Friday, September 28, 2007 5:50:25 PM

Matt,

   Thank you for updating me on the status of access improvements at Circa. I'm pleased that you've decided to make the Connecticut Avenue entrance the accessible one. As you know, that's what I view as the most sensible solution.

   I'm displeased (to say the least), however, at the lack of necessary and appropriate access to the restaurant for people with disabilities during the interim till a permanent solution is implemented. When I specifically asked you about that in our exchange of emails seven weeks ago, you replied: "*We propose moving one of the mobile tables on the Connecticut Avenue side and leaving that door unlocked – a sign will be posted. Due to the weather, it cannot be left ajar.*" But that's not what I found the two times I stopped by Circa this month (Sept. 1 & 8). The Connecticut Ave. door was shut. There were no handles or other hardware to open the door. A long table or counter was placed directly in front of the interior side of the door. I saw no sign. The Q Street entrance was unramped. (Interestingly, that door was propped open even though the temperature was around 90 degrees.) In other words, wheelchair access to the restaurant was every bit as bad as the first time I went there eleven weeks ago! For the reasons I stated in my first email to you in July, this is unacceptable.

   So, until you implement a permanent solution, will you provide a means of independent access for people with disabilities (that is, a means that doesn't require assistance from restaurant staff), such as by simply propping open the door at the Connecticut Ave. entrance (the preferred solution) or at least leaving that door unlocked, unblocked by furniture or fixture, equipped with accessible door hardware, and marked with a sign?
Marc Fiedler

   ----- Original Message -----
   **From:** mcarlin@mhggroup.com
   **To:** Marc Fiedler
   **Sent:** Wednesday, September 26, 2007 12:23 PM
   **Subject:** Circa at Dupont-follow up

   Marc,
   Hope all is well and apologize for the delay in getting back to you. We wanted to do our due diligence in evaluating our options and it took a little longer than we anticipated. We are now focusing on creating a permanent entrance on Connecticut Avenue with an automatic push button. We are meeting with our contractor and millwork company on Tuesday to discuss timing and pricing. After reviewing all options with our counsel, who has a fair amount of ADA experience, this alternative does appear to be the best option. It should not take too long and I think you will be satisfied. It is on the top of my priority list and I appreciate your assistance and patience.
   Sincerely,
   Matt

   Matthew Carlin
   CFO and COO
   The MHG Group of Companies
   6839 Redmond Drive
   McLean, VA  22101
   (cell) 703-629-435?
   (fax) 703-821-347?

**EXHIBIT D**

**From:** mcarlin@mhggroup.com
**To:** "Marc Fiedler" <mfiedler@starpower.net>
**CC:**
**Subject:** Circa at Dupont
**Date:** Friday, November 09, 2007 6:10:07 PM

Dear Marc,

I understand from one of my managers that you were inspecting our entrance
once again earlier this week.  You were taking photos as well.  As an update,
we have been working diligently over the past months to solve the handicap
entrance issue to your satisfaction.  Unfortunately, the process of changing
the exterior casing on the Connecticut Avenue side to now add a full service
door is turning out to be delayed longer than we originally anticipated.

The current schedule calls for it to be installed as we start construction on
the adjacent Moto Photo space which we are currently planning on acquiring
the first week of January.  The facade to that  space will be changed as well
to reflect a uniform look at CIRCA.  The existing handicapped entrance  to
that space will remain for fire exit purposes.  This is all subject to permit
approval by the City.  We do not anticipate any significant issues, however.

As far as what happens until then??  We continue to put the movable ramp in
place when a handicapped patron wishes to enter.  We have had numerous
opportunities to use this ramp to date and as you know we were given this
ramp suggestion by a handicapped member of our community.  We recognize this
does not meet your desires, but it is all we are prepared to offer at this
time.

As always feel free to contact me to discuss.

Sincerely,
Matt

Matthew Carlin
CFO and COO
The MHG Group of Companies
6839 Redmond Drive
McLean, VA  22101
(cell) 703-629-4352
(fax) 703-821-3473

**EXHIBIT E**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Marc Fiedler, et al.,

          Plaintiffs,

        v.

                                    Civil Action No. 1:08CV00225 (PLF)

MHG Café Dupont, LLC,

          Defendant.

## DECLARATION OF STEPHEN GAVULA

I, Stephen Gavula, declare and state as follows:

1.      I am the President and Managing Member of MHG Café Enterprises, LLC, of which MHG Café Dupont, LLC (dba Circa at Dupont or "Circa"), the named defendant in the above-captioned matter, is a wholly-owned subsidiary. As President and Managing Member, I manage Circa, located at 1601 Connecticut Avenue, NW, Washington, DC, which opened for business on April 17, 2007. My management responsibilities regarding Circa include design and structural issues. I offer this Declaration in support of the defendant's partial motion to dismiss plaintiff's complaint or to strike certain allegations. The statements set forth in this Declaration are based upon my personal knowledge and upon information that I acquired during the regular performance of my duties as President of the MHG Café Enterprises, LLC.

2.      At my direction, there have been a number of changes made at Circa. As of February 23, 2008, Circa changed its hours of business. Previously, Circa opened at 7 a.m. on weekdays and at 8 a.m. on weekends. Starting on February 23, 2008, and going forward, Circa opens at 11 a.m. on weekdays and at 10 a.m. on weekends. As of that date, wait service is

available during the entirety of Circa's business hours. Circa plans to continue to offer wait service during all business hours on a going-forward basis.

3.      In addition, all movable furniture in both restrooms at Circa have been removed. In addition, a trash can that used to be placed next to the counter space in the restroom has been moved to another part of the restrooms. These changes create a clear space of at least 60 inches in diameter in each restroom. I do not intend to place movable furniture in the restrooms at Circa in the future.

4.      The interior space at Circa has about 15 tables and a bar seating area that seat about 77 people. One of the tables in the interior space, which seats 6 people, has been modified to provide knee spaces at least 27 inches high, 30 inches wide, and 19 inches deep. The top of the table is between 28 to 34 inches off the finish floor of the ground.

5.      The exterior space at Circa has about 11 tables that seat about 25 people. One of the tables in the exterior space, which seats 2 people, provides knee spaces at least 27 inches high, 30 inches wide, and 19 inches deep. The top of the table is between 28 to 34 inches off the finish floor of the ground.

6.      Changes are also being made regarding access to the outside patio area. Building Resources, Inc., has been hired to install a 42 inch wide gate in the railing directly adjacent to the Q Street entrance to Circa. A 42 inch opening has been cut in the railing and I have been told by Building Resources, Inc. that the gate is expected to be installed within about two weeks.

7.      Circa is also in the process of making changes to its counters. Circa currently has a bakery case near the Connecticut Avenue and Q Street entrances. Building Resources, Inc., has been hired to remove the bakery case and install a new bar. Part of this new bar will

include a retractable shelf. The plans require the retractable shelf to be at least 36 inches wide and will be approximately 36 inches off the ground. The new bar is currently scheduled to be installed on April 3, 2008.

8.      Circa currently has two main entrances, one on Q Street and another on Connecticut Avenue. The Q Street entrance has a small step leading up to it. In July 2007, Circa purchased a portable ramp that can be used by an individual in a wheelchair to gain access to the restaurant. This portable ramp was brought to our attention by an individual who uses a wheelchair and the ramp has been used a number of times, although a number of individuals in wheelchairs have been able to gain access to Circa through the Q Street entrance without using the portable ramp. At one point Circa intended to install a more permanent ramp at the Q Street entrance and plans were drawn up to do so. However, the existence of a PEPCO manhole cover three feet away from the Q Street entrance presented a significant obstacle and prevented a permanent ramp from being installed.

9.      The current Connecticut Avenue entrance to Circa consists of two French doors. Handles have been installed on those doors and those doors are currently open during all business hours. Interior furniture blocking entrance to these doors has been removed. Circa has hired Adamstein & Demetriou Architecture and Design to draw up plans for a new door at the Connecticut Avenue entrance. That plan has been completed and is attached as Exhibit A. A door conforming to the plans drawn up the Adamstein & Demetriou firm has already been built. Before installing the door, however, permits must be obtained from the Historic Preservation Review Board, the District Department of Consumer and Regulatory Affairs, and the District Department of Transportation Public Space Permit Office. Circa has hired Restaurant Consultants, Inc., to assist with the permit process. I have been informed that, before permits

3

can be submitted, Circa needs to obtain a building plat from the Office of the Surveyor in the

D.C. Department of Consumer and Regulatory Affairs.  That building plat has been ordered and I

have been told that it is likely that the Office of the Surveyor will respond sometime during the

week of March 24.  My understanding is that, once the building plat has been received, the

permit applications can be filed shortly thereafter.  I have been informed that one possible

complicating factor in the permit process is the need to protect pedestrians walking by the door

when the door swings open.  The plans include the placing of planters on the sides of the door to

address that safety issue.  I have been told that the doors could likely be installed in about four

weeks following issuance of the permits.

I state under penalty of perjury that the foregoing is true and correct.

Washington, DC
March 24, 2008

_____
Stephen Gavula

**EXHIBIT A**



**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Marc Fiedler, *et al.*,

                Plaintiffs,

        v.                           Civil Action No. 1:08CV00225 (PLF)

MHG Café Dupont, LLC,

                Defendant.

### [PROPOSED] ORDER

1.      Defendant MHG Café Dupont, LLC's Partial Motion to Dismiss Plaintiffs' Complaint or to Strike Certain Allegations is GRANTED.

2.      It is hereby ORDERED that Plaintiffs' Americans with Disabilities Act claims based on the allegations in paragraphs 35(a) and (c) and 36 of the Complaint are dismissed as moot pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

3.      It is hereby further ORDERED that Count II (the "Second Claim for Relief") of the Complaint, which asserts a violation of the District of Columbia Human Rights Act, is dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated:                               _____

                                    Paul L. Friedman, U.S. District Judge