**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MARC FIEDLER            \*
     and                    \*
EQUAL RIGHTS CENTER,     \*
                             \*
        Plaintiffs,             \*
                             \*       CIVIL ACTION NO. 1:08-cv-00225
          v.                 \*
                             \*
MHG CAFÉ DUPONT, LLC,     \*
                             \*
        Defendant.           \*

_____/

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S PARTIAL MOTION TO DISMISS PLAINTIFFS' COMPLAINT OR TO STRIKE CERTAIN ALLEGATIONS

For the reasons stated in the accompanying memorandum, Plaintiffs Marc Fiedler and

Equal Rights Center respectfully request that Defendant MHG Café Dupont, LLC's Partial

Motion to Dismiss Plaintiffs' Complaint or to Strike Certain Allegations be denied.

                                 Respectfully submitted,

Dated: April 29, 2008

                                _Alan Swirski_
                                Alan Swirski, Bar No. 420046
                                1440 New York Ave., NW
                                Washington, DC 20005
                                Telephone: (202) 371-7610

                                _Elaine Gardner/by agft_
                                Elaine Gardner, Bar No. 27162
                                Washington Lawyers' Committee for
                                Civil Rights and Urban Affairs
                                11 Dupont Circle, NW
                                Suite 400
                                Washington, DC 20036
                                (202) 319-1000

                                Attorneys for Plaintiffs Marc Fiedler and
                                Equal Rights Center

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARC FIEDLER            *
    and            *
EQUAL RIGHTS CENTER,            *
             *
    Plaintiffs,            *
             *            CIVIL ACTION NO. 1:08-cv-00225
    v.            *
             *
MHG CAFÉ DUPONT, LLC,            *
             *
    Defendant.            *
_____/

**PLAINTIFFS MARC FIEDLER'S AND EQUAL RIGHTS CENTER'S
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S PARTIAL MOTION TO DISMISS PLAINTIFFS' COMPLAINT
OR TO STRIKE CERTAIN ALLEGATIONS**

Alan Swirski, Bar No. 420046
1440 New York Ave., NW
Washington, DC  20005
Telephone:  (202) 371-7610

Elaine Gardner, Bar No. 27162
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, DC  20036
(202) 319-1000

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

II.  BACKGROUND ............................................................................................. 2

III.  ARGUMENT ................................................................................................. 10

    A.  None of Plaintiffs' Claims Under the Americans With Disabilities Act Is Moot ......................................................................................... 10

        1.  Defendant Bears a Heavy Burden to Show It Has Mooted the Case ........ 10

        2.  Defendant Has Not Shown That Its Illegal Behavior Will Not Recur ......................................................................................... 11

        3.  Defendant's Bad Faith Actions Suggest It Will Reoffend As Soon As It Gets the Opportunity .................................................... 17

    B.  Plaintiffs Have Stated a Claim Under the District of Columbia Human Rights Act ......................................................................... 18

        1.  Plaintiffs' Undisputed Allegation that Defendant Violated the ADA Standards for Accessible Design States a Claim for Relief Under the DCHRA ........................................................ 20

        2.  Plaintiffs Have Also Stated a Case of Intentional Discrimination ........... 28

IV.  CONCLUSION ............................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007)................................................20

*Blodgett v. University Club*, 930 A.2d 210 (D.C. 2007) .................................................22

*Clavo v. Zarrabian*, No. SA CV 03-864 CJC, 2004 WL 3709049 (C.D. Cal. May
    17, 2004) ...................................................................................................15, 16

*Dean v. District of Columbia*, 653 A.2d 307 (D.C. 1995)................................................22

*East v. Graphic Arts Industrial Joint Pension Trust*, 718 A.2d 153 (D.C. 1998). ...........22

*EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621 (D.C. Cir. 1997)...............20

*Eiden v. Home Depot USA, Inc.*, No. Civ. S-04-977, 2006 U.S. Dist. LEXIS
    38423 (E.D. Cal. May 26, 2006) ..........................................................................17

*Executive Sandwich Shoppe, Inc. v. Carr Realty, Corp.*, 749 A.2d 724 (D.C.
    2000)........................................................................................................................22

*Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075 (9th Cir. 2004)......................12

*Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167
    (2000)..........................................................................................................1, 10, 14

*Gay Rights Coalition of Georgetown University Law Center v. Georgetown
    University*, 536 A.2d 1 (D.C. 1987) ................................................................21, 23

*Griffith v. Lanier*, __ F.3d __, 2008 WL 900978 (D.C. Cir. April 4, 2008)....................22

*Hall v. Ford*, 856 F.2d 255 (D.C. Cir. 1988) ..................................................................22

*Independent Living Resources v. Oregon Arena Corp.*, 982 F. Supp. 698 (D. Or.
    1997)........................................................................................................................17

*Kassem v. Washington Hospital Center*, 513 F.3d 251 (D.C. Cir. 2008) ........................20

*Kramer v. United States*, 460 F. Supp. 2d 108 (D.D.C. 2006) ........................................11

*Paralyzed Veterans of America v. Ellerbe Becket Architects & Engineers, P.C.*,
    950 F. Supp. 393 (D.D.C. 1996) ..............................................................19, 20, 25

*Reid v. Memphis Publishing Co.*, 468 F.2d 346 (6th Cir. 1972)......................................24

*Richardson v. United States*, 927 A.2d 1137 (D.C. 2007) ................................ 23

*Riley v. Bendix Corp.*, 464 F.2d 1113 (5th Cir. 1972) ................................ 24

*Sharp v. Rosa Mexicano, D.C., LLC*, 496 F. Supp. 2d 93 (D.D.C. 2007) ...................... 16

*Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173 (11th Cir. 2007) ...................... 14

*Tennessee v. Lane*, 541 U.S. 509 (2004) ................................ 11

*Wagner v. Taylor*, 836 F.2d 566 (D.C. Cir. 1987) ................................ 11

*Women Prisoners v. District of Columbia*, 93 F.3d 910 (D.C. Cir. 1996) ...................... 19

**Statutes and Rules**

28 U.S.C. § 1367(c) ................................ 19, 22

42 U.S.C. § 12182(a) ................................ 20

42 U.S.C. § 12182(b)(2)(A)(ii) ................................ 25

42 U.S.C. § 12186(b) ................................ 12

28 C.F.R. pt. 36 App. A ................................ *passim*

28 C.F.R. pt. 36 App. B ................................ 4

28 C.F.R. § 36.304 ................................ 4, 5

28 C.F.R. § 36.406(a) ................................ 12

29 C.F.R. § 1605.1(c) ................................ 24

D.C. Code § 2-1401.3(a) ................................ 21

D.C. Code § 2-1402.31(a) ................................ 21

D.C. Code § 2-1402.68 ................................ 21

D.C. Code § 2-1402.31(a)(1) ................................ 2

D.C. Code § 2-1402.68 ................................ 2

Fed. R. Civ. P. 8(a) ................................ 20

**Miscellaneous Sources**

U.S. Department of Justice, ADA Title III Technical Assistance Manual  III-
   3.1000 ......................................................................................................... 26

**I.**
**INTRODUCTION AND SUMMARY OF ARGUMENT**

Over a year after Defendant MHG Café Dupont, LLC, opened the Circa at Dupont restaurant ("Circa") for business, Defendant continues to deny persons who use wheelchairs the independent and safe access to Circa required by both federal and local law. Contrary to Defendant's revisionist claim that "time and again" it has worked diligently to help Plaintiff Marc Fiedler safely and properly access its restaurant, the facts show that precisely the opposite is true. Defendant's officers have insisted that disabled patrons accept (at best) a demeaning, unsafe, and illegal means of "access" to Circa.

When Circa opened for business, Defendant's officers sent a clear and unmistakable "Unwelcome" message to Plaintiff Fiedler and disabled members of Plaintiff Equal Rights Center by locking and blocking the nearly level entrance on Connecticut Avenue. Nine months after Plaintiff Fiedler brought this problem to their attention, Defendant's officers still do not provide an accessible entrance, and they have not posted any signage explaining to persons in wheelchairs how they can enter the restaurant.

Defendant does not and cannot dispute that it continues to violate the Americans with Disabilities Act ("ADA"). Defendant instead asks this Court to dismiss as moot portions of the complaint because it has decided, at least temporarily, that partial compliance with the law is less expensive than litigation. Defendant asks this Court to overlook the facts that (1) it remains in violation of the law and (2) it could easily reverse many of the practices and policies that it has grudgingly brought into compliance. Defendant's brief concedes (as it must) that this Court cannot dismiss as moot Plaintiffs' request for injunctive relief unless "it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 190 (2000) (emphasis added). Given (1)

Defendant's repeated refusals to provide independent and lawful access to Circa, after being given ample opportunity to do so, (2) its reliance on an inadequate alternative to access that it knew to be unlawful, (3) its failure even today to have brought its facility into compliance with the law, (4) Plaintiffs' recent discovery of additional violations of the law by Defendant, and (5) the fact that it could easily reverse its efforts to remedy some of its legal violations, Defendant cannot maintain that it is "<u>absolutely clear</u>" that its wrongful behavior could not reasonably be expected to recur. Therefore, Defendant's motion to dismiss for lack of jurisdiction or to strike certain allegations should be denied.

Defendant's objections to Plaintiffs' District of Columbia Human Rights Act ("DCHRA") claim must be rejected as well. Plaintiffs have alleged more than sufficient facts to prove that Defendant has denied, or had the effect of denying, "directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation." D.C. Code §§ 2-1402.31(a)(1); 2-1402.68. Defendant deprived Plaintiffs of "the full and equal enjoyment" of Circa's goods and services by blocking the Connecticut Avenue entrance through which those in wheelchairs had previously accessed the premises, by not providing an alternative accessible entrance, by selling goods at a counter that patrons in wheelchairs could not access, and through a host of other violations. Plaintiffs therefore respectfully request that the motion to dismiss their DCHRA claim be denied and that discovery on all claims be permitted to proceed forthwith.

In addition, Plaintiffs respectfully request oral argument on this motion.

## II.
## BACKGROUND

Plaintiff Marc Fiedler, a resident of the District of Columbia, has physical impairments that limit him in the major life activities of walking and performing everyday manual tasks.

Declaration of Marc Fiedler ("Fiedler Dec."), attached hereto as Exhibit A, at ¶ 2. He uses a

wheelchair for mobility. *Id.* After reading about the opening of Circa, he attempted to visit the

restaurant on July 14, 2007. *Id.* at ¶ 3. But a 5-inch step at Circa's Q Street entrance prevented

him from even reaching the front door. *Id.* Circa had not posted an outdoor sign advising how

he or any other customer in a wheelchair could access the restaurant. *Id.* Mr. Fiedler noted that

the restaurant entrance on Connecticut Avenue, which a prior tenant (Wrapworks) had propped

open for access during business hours, was now closed, locked, and blocked with furniture Circa

had placed inside the restaurant. *Id.*

    A few days after he tried to enter Circa in his wheelchair, Mr. Fiedler, who is an attorney,

sent an email to Defendant's President, Stephen Gavula, and to its Chief Operating Officer,

Matthew Carlin, noting the lack of an accessible entrance and explaining why the situation at

Circa was unlawful:

> Federal and local civil-rights laws require the main entrance of businesses like
> yours to be open and readily available for use by all customers, including those
> who have a disability. That requirement isn't met where a customer with a
> disability must request that an accessible-but-closed entrance be opened. The
> business effectively foists onto that customer a humiliating burden that other
> customers needn't bear. It's unfair, discriminatory, and unlawful.
>
> The entrance to the restaurant that previously occupied that space was on
> Connecticut Avenue and was easy to use by everyone. Customers didn't have to
> watch their step.
>
> Will you rectify the problem I encountered? How? When?

Exh. A to Def. Motion to Dismiss ("Def. Motion") (July 17, 2007, email from M. Fiedler to S.

Gavula and M. Carlin of MHG Group).

    Mr. Carlin replied to Mr. Fiedler by email on July 18, 2007. Mr. Carlin wrote that, based

on the recommendation of a woman from the neighborhood who used a wheelchair, he had

purchased a portable wheelchair ramp for disabled patrons to use to enter Circa through the Q

Street entrance.  Mr. Carlin added that he wanted Mr. Fiedler's opinion about the ramp.  Exh. A

to Def. Motion (July 18, 2007, email from M. Carlin to M. Fiedler).

Mr. Fiedler met with Mr. Carlin outside Circa the following week.  They discussed the

legal rights guaranteed by the ADA, and Mr. Carlin expressed a preference for constructing an

accessible entrance on Q Street.  *See* Exh. A to Def. Motion (July 26, 2007, email from M.

Fiedler to M.Carlin).  Mr. Fiedler informed Mr. Carlin that an accessible entrance on Connecticut

Avenue would be preferable because (1) it would be easier to obtain any necessary permits, (2) it

would not require a ramp, which is more difficult and more dangerous for everyone to use, and

(3) it would likely prove less expensive.  *See id*.  At this meeting, Mr. Carlin also showed Mr.

Fiedler the portable ramp he had purchased.  Mr. Fiedler told Mr. Carlin that the ramp plainly

violated the ADA because it was too steep and because it did not have a level top landing.

Answer at ¶¶ 27-28; Fiedler Dec. at ¶ 5.

Defendant does not contend that this ramp complies with the ADA.  Rather, it

characterizes the ramp as an interim measure until a "more permanent solution" can be

implemented.  Answer at ¶ 28.  Defendant has now been relying on this so-called "interim"

solution for almost a year.  The ADA regulations do not tolerate such lollygagging.  They

specifically note that portable ramps present an "inconvenience to individuals with disabilities"

and serious "safety problems."  28 C.F.R. pt. 36 App. B (analysis of § 36.304).  The regulations

therefore forbid their use except where installation of a permanent ramp is "not readily

achievable."  28 C.F.R. § 36.304(e).  Because of those same safety concerns, the Standards adopt

strict rules for ramps.  See ADA Standards for Accessible Design, 28 C.F.R. pt. 36 App. A[1]

§ 4.8.2 (ramp slope may not exceed one inch of rise per foot of run); *id.* § 4.8.4 (ramp must have

level landings at top and bottom); id. § 4.8.7 (ramp and landing must have curbs, walls, railings,

---

[1]  The ADA Standards for Accessible Design are referred to as the "Standards" throughout this memorandum.

or projecting surfaces that prevent people from slipping off); 28 C.F.R. § 36.304(e) (portable ramp may be used only if installation of a permanent ramp is "not readily achievable"). There can be no dispute that the ramp Circa purchased violates the ADA. Circa has not argued, and cannot argue, that providing a permanent, ADA compliant means of access is not readily achievable. Even though it knew the portable ramp violated the ADA, Defendant offered no other means of access for customers in wheelchairs during the following months. *See* Exh. E to Def. Motion (Declaration of Stephen Gavula) ("Gavula Dec.") at ¶ 8; Answer at ¶ 28; Exh. D to Def. Motion (Nov. 9, 2007, email from M. Carlin to M. Fiedler) (stating that portable ramp "is all we are prepared to offer at this time").

After this meeting, Mr. Fiedler sent Mr. Carlin another email clarifying the issues they had discussed at their meeting. *See* Exh. A to Def. Motion (July 26, 2007, email from M. Fiedler to M. Carlin). Mr. Fiedler quoted the regulations requiring Circa to maintain an unlocked accessible entrance during business hours, and he told Mr. Carlin again that he believed an entrance on Connecticut Avenue would be better and cheaper than an entrance on Q Street. *Id.* The main point of Mr. Fiedler's email, however, was to express the urgency of bringing Circa into permanent compliance with the law and the need to offer an acceptable alternative in the interim:

> Whatever alternative you choose, it must be implemented right away. Now, without an accessible entrance, Circa violates the law and discriminates against people with disabilities. That may not be your intent, but it's the unmistakable effect. You say you simply wish to serve the community, but you must realize that people with disabilities are part of the community too, and failure to serve us like you do others is not only unconscionable but also unlawful.
>
> So once again I ask you: Will you rectify this problem? How? When? Until you implement a permanent solution, please open up the Connecticut Avenue entrance so people with disabilities will have an accessible way to enter and exit your restaurant. Will you do that? Kindly respond promptly and with specificity.

*Id.*

Two weeks later, Mr. Carlin advised Mr. Fiedler by email that Circa planned to install a ramp on casters at the Q Street entrance, because Circa was "unable to create a solution [of] moving the front door to Conn. Ave[.] for a number of reasons." *See* Exh. B to Def. Motion (August 9, 2007, email from M. Carlin to M. Fiedler) (emphasis added). Mr. Carlin did not, however, identify any of those reasons. In response, Mr. Fiedler asked a series of questions about the proposed ramp, including how Circa would provide access for people with disabilities until the new ramp was installed. *See* Exh. B to Def. Motion (August 9, 2007, email from M. Fiedler to M. Carlin). Mr. Carlin replied: "We propose moving one of the mobile tables on the Connecticut Avenue side and leaving that door unlocked − a sign will be posted. Due to weather, it cannot be left ajar." *See* M. Carlin email to M. Fiedler dated August 10, 2007, attached hereto as Exhibit B. But Defendant did not do what it had promised: It inexplicably left the tables blocking the Connecticut Avenue entrance; it did not unlock the Connecticut Avenue door; and it did not post a sign advising disabled patrons how they could access Circa. Fiedler Dec. at ¶ 7.

Defendant then once again proved that it could not be taken at its word. Although it had told Mr. Fiedler in August that it was "unable" to move the front door to Connecticut Avenue, six weeks later it wrote to advise him that it was "now focusing on creating a permanent entrance on Connecticut Avenue with an automatic push button." Exh. C to Def. Motion (September 26, 2007, email from M. Carlin to M. Fiedler). During the six weeks Defendant was busy changing its story, it continued to use the unsafe and noncompliant portable ramp for disabled customers. Gavula Dec. at ¶ 8; Answer at ¶ 28.

Mr. Fiedler expressed approval of the idea of a Connecticut Avenue entrance, which he had urged all along. *See* Exh. C to Def. Motion (September 28, 2007, email from M. Fiedler

email to M. Carlin). But he strongly disagreed with Circa's continuing failure to provide lawful

access to the restaurant in the interim, as he had been requesting since July 2007:

> I'm displeased (to say the least), however, at the lack of necessary and appropriate
> access to the restaurant for people with disabilities during the interim till a
> permanent solution is implemented. When I specifically asked you about that in
> our exchange of emails seven weeks ago, you replied: *"We propose moving one
> of the mobile tables on the Connecticut Avenue side and leaving that door
> unlocked – a sign will be posted. Due to the weather, it cannot be left ajar."* But
> that's not what I found the two times I stopped by Circa this month (Sept. 1 & 8).
> The Connecticut Ave. door was shut. There were no handles or other hardware to
> open the door. A long table or counter was placed directly in front of the interior
> side of the door. I saw no sign. The Q Street entrance was unramped.
> (Interestingly, that door was propped open even though the temperature was
> around 90 degrees.) In other words, wheelchair access to the restaurant was every
> bit as bad as the first time I went there eleven weeks ago! For the reasons I stated
> in my first email to you in July, this is unacceptable.
>
> So, until you implement a permanent solution, will you provide a means of
> independent access for people with disabilities (that is, a means that doesn't
> require assistance from restaurant staff), such as by simply propping open the
> door at the Connecticut Ave. entrance (the preferred solution) or at least leaving
> that door unlocked, unblocked by furniture or fixture, equipped with accessible
> door hardware and marked with a sign?

*Id.* Defendant never answered Mr. Fiedler's question. Fiedler Dec. at ¶ 8.

Plaintiff Fiedler received Defendant's final email on November 9, 2007. *See* Exh. D to

Def. Motion. The email was apparently prompted by a Circa manager witnessing Mr. Fiedler

taking photos of the restaurant space. *Id.* Mr. Carlin explained in the email that Circa was

planning to acquire additional space next door (then occupied by a MotoPhoto store) and that

any solution to Mr. Fiedler's access complaints would have to wait until Circa acquired the

MotoPhoto space. *Id.* Although Mr. Carlin had long known that the portable ramp was not a

legal option for providing access to Circa, he candidly admitted that "[w]e continue to put the

moveable ramp in place when a handicapped patron wishes to enter. We have had numerous

opportunities to use this ramp to date and as you know we were given this ramp suggestion by a

handicapped member of our community." *Id.* Mr. Carlin then advised Mr. Fiedler that Circa

viewed compliance with the law as optional and subject to negotiation, concluding that "[w]e recognize this does not meet your desires, but it is <u>all we are prepared to offer</u> at this time." *Id.* (emphasis added).

By January 2008, when representatives of Plaintiff Equal Rights Center inspected Circa, the restaurant was still in the same unlawfully inaccessible state it was in when Mr. Fiedler sent his first email to Circa's officers in July of 2007. Defendant admits that it still had not posted signage indicating how a person in a wheelchair could enter the restaurant. Answer ¶ 35. Even worse, Circa was committing numerous additional ADA violations Mr. Fiedler had not had the opportunity to notice (since he had never actually made it into the restaurant). *See* Fiedler Dec. at ¶ 9; Declaration of Jennifer Conrad, attached hereto as Exhibit C ( "Conrad Dec.") at ¶ 3. Circa had no tables that complied with the ADA. Each one rested on a pedestal rising from the center of a round base that was so large as to prevent a person using a wheelchair from getting close enough to the table to eat. Standards § 4.32. *See* Conrad Dec. at ¶ 4; Answer ¶ 35. The restaurant's service counter was too high for persons in wheelchairs to reach. Standards § 7.2(1). *See* Conrad Dec. at ¶ 5; Answer ¶ 35. Furniture in the restrooms denied persons in wheelchairs a sufficient turning radius to exit. Standards §§ 4.22; 4.2.3. *See* Conrad Dec. at ¶ 6; Answer ¶ 35. The entire outdoor dining area was inaccessible because the gates at the outside entrance were too narrow for a person using a wheelchair to fit through, and a steep unramped step prevented access to the outdoor dining area from inside the restaurant. Standards §§ 4.3.8; 4.13.3; 4.13.5. *See* Conrad Dec. at ¶ 7; Answer ¶ 35.

On March 24, 2008, Mr. Gavula filed with the Court a declaration stating that Circa had attempted to remedy some of its ADA violations. On April 8, 2008, with the permission of Defendant's counsel, Plaintiffs visited Circa and discovered still more ADA and DCHRA

violations in the restaurant.  The Connecticut Avenue entrance, which Defendant had finally unlocked in order to permit access to patrons in wheelchairs, is still inaccessible.  The widest door at the Connecticut Avenue entrance is 22¼ inches wide, far less than the 32-inch minimum mandated by the Standards.  *See* Declaration of E. Elaine Gardner, attached hereto as Exhibit D ("Gardner Dec.") at ¶ 3; *see also* Standards §§ 4.13.4; 4.13.5 (doorways must be at least 32 inches wide; doorways composed of two independently operated leaves must have at least one leaf 32 inches wide).  Moreover, the threshold at the doorways is 1½ inches high, a change in level that the Standards require to be accomplished by an accessible ramp.  *See* Gardner Dec. at ¶ 4; Standards §§ 4.5.2; 4.13.8.  In addition, even if the doors were accessible, a table and chairs inside the restaurant would likely obstruct the entrance.  While Mr. Gavula's statement that "[i]nterior furniture blocking the entrance to these doors has been removed" is true, Circa has pushed a table (which is on wheels) and chairs near the door into a cramped space.  Diners are likely to create more space for themselves by pushing the table and chairs out and thus to obstruct the Connecticut Avenue doors with their chairs.  *See* Exhibit 1 to the Declaration of Zachary Kagan-Guthrie, attached hereto as Exhibit E; Gardner Dec. at ¶ 5.

Problems remain with the service counter as well.  Though the service counter has been redone, the new counter is 43½ inches high.  Gardner Dec. at ¶ 6.  The Standards, however, deem inaccessible service counters in excess of 36 inches in height.  Standards § 7.2(2).  The Standards allow that if it is not technically feasible to provide an accessible counter, an auxiliary counter, which meets the requirements, may be provided.  *Id.*  Defendant has installed a ledge, but the placement of the ledge is such that patrons cannot be served on it, nor can they hand money to the cashier by placing it on the ledge.  Gardner Dec. at ¶ 6.

Finally, the restrooms are also in violation of the Standards. The force required to open the doors to each restroom exceeds the legal limit. *See* Gardner Dec. at ¶ 8. The Standards provide that an interior hinged door shall not require more than 5 pounds-force to open. Standards § 4.13.11(2)(b). The door to the men's room requires 10 pounds-force, while the door to the ladies room requires 8 pounds-force.

On April 22, 2008, Circa filed with the Court another declaration from Mr. Gavula. Mr. Gavula began the declaration by changing his story yet again—he had to retract claims in his prior declaration that Circa's restrooms provide a clear space for a wheelchair to turn around of at least 60 inches in diameter and that six seats at an interior table provide knee spaces at least 27 inches high, 30 inches wide, and 19 inches deep. Although Mr. Gavula claimed that Circa had remedied more of Plaintiffs' claims, he could not and did not state that Circa has remedied all of its ADA violations. In sum, as Circa celebrates one year in operation, it has not cured violations of the law that were brought to its attention at the latest last summer, and it is committing additional violations of the law that Plaintiffs were not aware of until recently because Defendant's inaccessible entrance prevented them from inspecting the premises.

### III.
### ARGUMENT

**A.     None of Plaintiffs' Claims Under the Americans With Disabilities Act Is Moot.**

**1.     Defendant Bears a Heavy Burden to Show It Has Mooted the Case.**

Defendant argues that, after almost a year of willful and flagrant violation of the ADA, it has mooted part of Plaintiffs' complaint through its voluntary cessation of illegal conduct. The Supreme Court has held that in making this argument, Defendant bears a "heavy burden." *Friends of the Earth*, 528 U.S. at 189. Voluntary cessation of illegal conduct does not moot the case unless "it can be said with assurance that there is no reasonable expectation . . . that the

alleged violation will recur . . . and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Wagner v. Taylor*, 836 F.2d 566, 570 n.33 (D.C. Cir. 1987) (alterations in original) (internal quotation marks omitted) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).

In reviewing Defendant's motion, the court must accept as true all of Plaintiffs' factual allegations, but it may also consider materials outside the pleadings. *See Kramer v. United States*, 460 F. Supp. 2d 108, 109 (D.D.C. 2006). Plaintiffs agree with Defendant, *see* Def. Motion at 5 n.2, that this Court should take into account the email communications between Mr. Fiedler and Defendant's officers in 2007. Plaintiffs attach one additional such email as an exhibit to this filing. Plaintiffs also respectfully request that the Court consider Plaintiffs' declarations attached to this filing.

### 2.    Defendant Has Not Shown That Its Illegal Behavior Will Not Recur.

When Congress enacted the Americans with Disabilities Act, it determined that

> "individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society."

*Tennessee v. Lane*, 541 U.S. 509, 516 (2004) (quoting 42 U.S.C. § 12101(a)(7)). Congress made clear why it was passing the ADA: "'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Id.* (quoting 42 U.S.C. § 12101(b)(4)).

Title III of the ADA forbids discrimination by public accommodations, such as restaurants like Circa, against those with disabilities. Congress delegated to the Department of Justice authority to promulgate regulations to implement Title III. *See* 42 U.S.C. § 12186(b).

11

Under this authority, the Department of Justice adopted regulations, including its Standards for Accessible Design. *See generally Fortyune v. Amer. Multi-Cinema, Inc.*, 364 F.3d 1075, 1080-81 (9th Cir. 2004). The Standards are to be applied during the design, construction, and alteration of public accommodations. 28 C.F.R. § 36.406(a). The Standards provide specific requirements for accessibility regarding entrances, dining areas, and restrooms, among other things.

Plaintiffs' complaint alleged Defendant was committing six ongoing violations of the Standards. As an initial matter, it is important to note what the Motion to Dismiss glosses over—Defendant's concession that, over a year after it opened, it continues to lack an accessible entrance and appropriate signage directing individuals with disabilities how to effect entry. Moreover, in its most recent filing with the Court, Circa proves that its practice of making representations without first checking the facts continues unabated: Mr. Gavula's most recent declaration retracts two of his prior statements regarding Circa's efforts to comply with the ADA.

In the two declarations from Mr. Gavula, Defendant claims that it now has removed the moveable furniture in both restrooms, installed one table indoors and one outdoors each with two accessible seating spaces for wheelchair users, installed a new gate for the outdoor patio, removed the bakery case, and changed its hours of operation so that wait service is now offered during all of its business hours. Closer inspection reveals that these remedial efforts are insubstantial and easily reversed. First, Mr. Gavula has "corrected" his declaration so that it now no longer states the turning radius available in the restrooms. Circa therefore has presented no evidence that its restrooms are ADA-compliant. And although it took Mr. Gavula two months after receiving the Complaint to warrant that Circa had removed the furniture from the

bathrooms, he could place it back in the restrooms in just a few minutes.  Second, Circa has installed a grand total of two accessible tables.  Had Circa been committed to compliance with the law, it could have taken the same steps months ago, and it could just as easily remove the accessible tables if the Court were to deem the claims moot.  Third, notwithstanding the installation of a new gate, Circa has not stated whether a disabled patron must first enter the restaurant in order to be seated outside by restaurant staff.  If Circa policy is to require patrons to wait inside for a host to seat them outside, the patio seating will be inaccessible until Circa has an accessible entrance to the restaurant.  And without signage announcing the procedure, a patron in a wheelchair will not know how to gain access to the patio.  Fourth, although the removal of the bakery case and the installation of a bar seems like a substantial architectural modification, in reality it is not a modification that brings Defendant closer to ADA compliance. Defendants concede that the new bar remains too high, and the retractable shelf Mr. Gavula mentions in his new declaration does not permit a patron to be served or to hand over payment. It therefore does not serve the purpose envisioned by the Standards.  Finally, Mr. Gavula does not claim that Circa will never return to its prior practice of having only counter service during certain hours should Defendant decide that would be a profitable activity.  There is nothing to stop Defendant from discontinuing its new business hours and wait-service policy as easily as it instituted them.

At least as notable as the changes Mr. Gavula claims Circa has made, however, is what Mr. Gavula does <u>not</u> claim:  Mr. Gavula declares not that he <u>will</u> remain in compliance but instead that he "<u>plans</u> to continue" complying with the law and that he does "not <u>intend</u> to" violate the law.  Gavula Dec. at ¶¶ 2, 3 (emphasis added).  Plans and intentions have a funny way of changing once the threat of liability disappears.  The Supreme Court has held that claims

like these are not moot unless it can be said with assurance Defendant will not lapse into noncompliance. *Friends of the Earth*, 528 U.S. at 190. How can the Court make such a finding when Defendant does not even state definitively that it will remain in compliance with the law? Defendant's equivocations cannot carry its heavy burden to show that it has mooted the case. This is especially so given that it would take Defendant only a few hours to lock its Connecticut Avenue doors, rearrange its tables, move the furniture back to the restrooms, or change its staffing practices. Even if Defendant had produced declarations promising to comply with the ADA, its history of changing its story would prevent those declarations from being taken at face value. Given the numerous violations of the law Plaintiffs discovered during their April 8, 2008, visit to Circa, there is no reason to believe Circa is committed to complying with the law. Even if Defendant were to cure its multiple legal violations, which it has not, injunctive relief would be needed to ensure that Defendant will not return to discriminating against individuals with disabilities as soon as legal proceedings conclude.

Caselaw makes clear that easily reversed changes made under threat of litigation are insufficient to moot an ADA case. In *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173 (11th Cir. 2007), the defendant refused to allow guide animals into its premises. It change d its policies only after litigation had been filed. The district court held that the claims were therefore moot, but the Court of Appeals reversed. In the mootness inquiry, the Court of Appeals found

> relevant at least the following three factors: (1) whether the challenged conduct was isolated or unintentional, as opposed to a continuing and deliberate practice; (2) whether the defendant's cessation of the offending conduct was motivated by a genuine change of heart or timed to anticipate suit; and (3) whether, in ceasing the conduct, the defendant has acknowledged liability.

*Id.* at 1184. Like Circa, the defendant in *Sheely* filed declarations claiming it had had a change of heart. In some ways, *Sheely* presented a stronger case for mootness than does Circa because the defendant in that case cured all of its ADA violations. Nevertheless, the Court of Appeals

14

held that the defendant failed each of the three factors listed above.  Circa fails all three factors

as well:  Defendant intentionally closed Circa's Connecticut Avenue entrance, and its ongoing

ADA violations after a year in business evidence "a continuing and deliberate practice" of

denying patrons in wheelchairs full and equal access to the restaurant.  Defendant did little to

remedy its ADA violations, even though Mr. Fiedler repeatedly urged its officers to do so, until a

lawsuit was imminent; there can be little doubt that its recent changes stem from its realization of

the weakness of its litigating position.  And Defendant is vigorously contesting its liability, not

acknowledging it.

    In *Clavo v. Zarrabian*, No. SA CV 03-864 CJC (RCx), 2004 WL 3709049 (C.D. Cal.

May 17, 2004), a grocery store had padlocked its only accessible entrance, just as Circa closed

its Connecticut Avenue entrance before it opened for business last April.  *Id.* at *1.  The grocery

store, like Circa, expected Mr. Clavo to wait for an employee to locate a key to let him into the

store.  *Id.*  As at Circa, the grocery store during certain hours had no accessible cashier, in that its

accessible check-out line was often closed and unstaffed.  *Id.*  After complaining to no avail, the

plaintiff ultimately filed suit.  Approximately five months after the suit was filed, the grocery

store replaced the padlocked gate with one that could not be padlocked, widened the existing

accessible check-out aisle, added another accessible check-out aisle, and instituted a written

policy that the gate be kept unlocked and the check-out aisle staffed at all times.  *Id.*  Like Circa,

the grocery store made some physical alterations to its premises and some policy changes.

Notwithstanding these changes, the district court rejected the grocery store's claim that it had

mooted the case:

> Defendant's implementation of a new policy does not eliminate the possibility of
> future violations when it has always had a wheelchair accessible gate and check-
> out aisle, it had an entrenched policy of blocking access to those fixtures in

violation of well established law and, despite Plaintiff's complaints, it failed to change that policy until after this case was filed.

*Id.* at *4; *see also id*. ("Defendant's voluntary cessation of the challenged practices does not deprive this Court of its power to determine the legality of those practices.").

Like the grocery store in *Clavo*, Circa did not begin to address its violation of the law until after it faced the coercive power of litigation. Remedial action to posture poor facts under threat of litigation does not show good faith; at most it is evidence of good defense lawyering. Defendant did not, as it states in its Motion, "diligently work[] to rectify plaintiffs' concerns . . . ." *See* Def. Motion at 1. Over the course of approximately four months, Defendant proposed three different alternatives for making the restaurant accessible. All were either noncompliant with the law or were infeasible. Circa then proceeded to refuse to implement any means to make the restaurant accessible, seeking to avoid the cost other restaurants bear of providing full and equal access to all members of the community. It was not until Plaintiff Fiedler retained counsel and sent Defendant a demand letter and draft complaint on or about January 23, 2008, that Defendant grudgingly took actions to begin to comply with the ADA and the DCHRA. For example, as stated in the Declaration of Stephen Gavula, Circa waited until February 23, 2008, to alter its schedule to offer wait service during all hours of its operation. Gavula Dec. at ¶ 2.

If Defendant would like an example of how to moot a case seeking an injunction for ADA violations, perhaps its officers should take the short (and wheelchair-accessible) Metro ride to Chinatown and dine at Rosa Mexicano. In *Sharp v. Rosa Mexicano, D.C., LLC*, 496 F. Supp. 2d 93 (D.D.C. 2007), which Defendant cites three times, the restaurant had long been in compliance with the ADA except for one alleged design flaw in the restroom sink. Within a few months of receiving the complaint, the restaurant rebuilt the sink in a way that would be difficult

and costly to remove. The district court held that the case was moot because the modifications had become "a *fixture* within the restaurant." *Id.* at 99 (emphasis in original). Similarly, in the other two cases Defendant cites, the Court found ADA claims moot only after Defendant remedied those claims with design changes that would be costly to undo. *See Eiden v. Home Depot USA, Inc.*, No. Civ. S-04-977, 2006 U.S. Dist. LEXIS 38423, at *31 (E.D. Cal May 26, 2006) (describing Home Depot's replacement of signage, handles, and restroom fixtures); *Indep. Living Res. v. Oregon Arena Corp.*, 982 F. Supp. 698, 777 (D. Or. 1997) (*e.g.*, defendant installed permanent bicycle rack, modified the architecture of the lavatories, and installed visual fire alarms). Defendant, unlike Rosa Mexicano, has done nothing to its restaurant to improve accessibility that it cannot undo in a matter of minutes.

### 3. Defendant's Bad Faith Actions Suggest It Will Reoffend As Soon As It Gets the Opportunity.

Defendant's behavior over the last year does not demonstrate the good faith that would show the Court it is committed to meeting its ADA obligations. Defendant has not ceased using a dangerous ramp that does not comply with the ADA. The fact that the portable ramp was allegedly suggested by another patron with a disability cannot excuse Defendant from its obligation to provide an ADA-compliant, safe, and independently usable means of access to Circa—which the portable ramp is not—and cannot relieve Defendant from liability under the ADA and the DCHRA. Nor has Defendant shown good faith by publicizing the availability of the ramp to the community, notwithstanding its promise months ago (and its legal obligation) to do so. *See* Exh. A to Def. Motion (promising to install such a sign); Standards § 4.1.6(1)(h). As of April 8, 2008, the only visual messages Circa communicated to individuals using wheelchairs were the five-inch step at the Q Street entrance and the closed door on Connecticut Avenue. To Circa, that five-inch step may seem "small" and insignificant, *see* Answer at ¶ 25, but to those

17

who use wheelchairs, for whom unaided entrance without a ramp would be virtually impossible, it is anything but.

Even if a customer in a wheelchair were somehow to learn of the existence of the ramp and were willing to risk using the noncompliant ramp, Defendant has not taken the simple, good-faith step of installing a means by which that customer can notify staff to set up the ramp. How difficult would it have been for Defendant to install a doorbell while it worked to bring its entrance into permanent compliance? Instead, Circa demands that an individual in a wheelchair wait patiently outside until (and if) someone at Circa notices the individual and decides to set up the ramp.

Defendant's multiple ongoing ADA violations demonstrate that it is not acting in good faith to bring its restaurant into compliance with the law as quickly as possible. Defendant's cavalier approach to its obligations under the ADA suggests that its "plans" and "intentions" to comply with the law are nothing but litigation posturing. In light of these facts, Defendant cannot possibly prove to the court that there is no reasonable expectation its illegal conduct will recur. It has therefore failed utterly to carry its heavy burden to show that this case is moot. Plaintiffs respectfully request that Defendant's Motion to Dismiss for Lack of Jurisdiction be denied.

**B.      Plaintiffs Have Stated a Claim Under the District of Columbia Human Rights Act.**

Defendant argues that its concession that it has violated the ADA cannot serve as a predicate for finding that it has also violated the District of Columbia Human Rights Act. This Court, in a published opinion authored by Judge Hogan and addressing the DCHRA's public accommodations provisions, has already held that Defendant's argument is incorrect: "[T]he D.C. law is applied in the same manner as the parallel federal antidiscrimination provisions."

18

*Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng 'rs, P.C.*, 950 F. Supp. 393, 405

(D.D.C. 1996), *aff 'd on other grounds* 117 F.3d 579 (D.C. Cir. 1997).  Defendant cites no

contrary construction of the DCHRA.  Instead, Defendant contends that Judge Hogan 's holding

is unconsidered dicta.  Far from it.  The Court in *Paralyzed Veterans* considered whether

construction plans for the multi-million dollar facility now known as the Verizon Center

provided sufficient seating and sight lines for patrons using wheelchairs.  The case attracted

some of the most prominent lawyers in the city on both sides, and the defendants argued that the

plaintiffs had failed to state a claim under the Human Rights Act.  Judge Hogan 's opinion noted

first that the "D.C. courts have always looked to cases from the federal courts in interpreting the

D.C. Human Rights Act, and have followed, wherever applicable, precedents from the  federal

courts' treatment of comparable civil rights statutes." *Id.* at 405 (citing four cases from the D.C.

Court of Appeals).  It then stated that "[t]his Court has also applied legal standards under the

ADA to claims under the D.C. Human Rights Act." *Id.* (citing one case).  It therefore concluded

that "the D.C. law is applied in the same manner as the parallel federal antidiscrimination

provisions." *Id.*  That Judge Hogan, in his landmark decision in a high-profile case, did not see

the need to devote pages of analysis of his published opinion to reach this conclusion does not, as

Defendant implies, denote sloppy judging.  Instead, it shows that this is not a difficult question. [2]

> **1.    Plaintiffs' Undisputed Allegation that Defendant Violated the ADA Standards for Accessible Design States a Claim for Relief Under the DCHRA.**

Under Federal Rule of Civil Procedure 8(a)(2), a plaintiff need only provide  "a short and

plain statement of the claim showing that the pleader is entitled to relief."  In considering a

---

[2] If this Court finds the question whether the D.C. Human Rights Act imposes affirmative obligations on an operator of a public accommodation "raises a novel or complex issue of State law," Plaintiffs respectfully request that it decline to exercise supplemental jurisdiction over the claim. 28 U.S.C. § 1367(c)(1); *see Women Prisoners v. District of Columbia*, 93 F.3d 910, 920 -23 (D.C. Cir. 1996) (finding the district court's decision to accept supplemental jurisdiction over a novel question of D.C. law an abuse of discretion).

motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), the Court must evaluate the sufficiency of Plaintiffs' complaint. The Court may also consider documents attached to the complaint and matters of which it may take judicial notice. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 625 (D.C. Cir. 1997). Declarations attached to the motion to dismiss, which may be considered under Rule 12(b)(1), have no bearing on a Rule 12(b)(6) motion. Instead, the court must construe the complaint liberally in Plaintiffs' favor, and it must accept "the complaint's allegations as true and dra[w] all reasonable inferences in [Plaintiffs'] favor." *Kassem v. Washington Hosp. Ctr.*, 513 F.3d 251, 252 (D.C. Cir. 2008). The Supreme Court has made clear that where plaintiffs have pleaded "enough facts to state a claim for relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007), the court must allow the action to proceed. Simply put, there is no "probability requirement at the pleading stage." *Id.* at 1965. Plaintiffs have alleged, and Defendant has not disputed, that the conditions at Circa violated (and continue to violate) the ADA Standards for Accessible Design. Therefore, if violation of the Standards is also a violation of the DCHRA, as Judge Hogan held it was in *Paralyzed Veterans*, there can be no doubt that Plaintiffs have stated a DCHRA claim upon which relief can be granted.

Title III of the ADA and the DCHRA both require public accommodations to make reasonable accommodations for disabled customers. The ADA forbids discrimination on the basis of disability in "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). The Human Rights Act uses identical language:

> It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based on the actual or perceived . . . disability . . . of any individual:

>    (1) To deny, directly or indirectly, any person the full and equal
>    enjoyment of the goods, services, facilities, privileges, advantages,
>    and accommodations of any place of public accommodations.

D.C. Code § 2-1402.31(a)(1).  The DCHRA goes further than the ADA, however, in one

essential respect.  In addition to its ban on intentional discrimination, the DCHRA provides that

"[a]ny practice which has the effect or consequence of violating any of the provisions of [the

DHCRA] shall be deemed to be an unlawful discriminatory practice." *Id.* § 2-1402.68.

Defendant buries this clause in a footnote and never mentions it again.  *See* Def. Motion at 11

n.5.  The D.C. Court of Appeals has held that this clause deems practices "unlawful if they bear

disproportionately on a protected class and are not independently justified for some

nondiscriminatory reason." *Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown

Univ.*, 536 A.2d 1, 29 (D.C. 1987) (en banc).  Practices that have a discriminatory effect can be

justified only by business necessity, that is, if the business could not operate without the practice.

D.C. Code § 2-1401.3(a).  The DCHRA explicitly provides that increased cost to the business

does not constitute business necessity.  *Id.*  Defendant makes no effort whatsoever to justify its

noncompliance with the law as a business necessity.

Defendant's argument proceeds as follows:  The public accommodations provisions of

the ADA both ban discrimination and require reasonable accommodations, but the public

accommodations provisions in the DCHRA ban intentional discrimination and say nothing about

reasonable accommodations.  This omission was intentional, Defendant argues, because

regulations under the DCHRA require employers and housing owners to make reasonable

accommodations.  Defendant argues that the Court should therefore imply that the DCHRA does

not require public accommodations to make reasonable accommodations.  Defendant piles

negative implication upon negative implication in the hope that the Court will gut the DCHRA's public accommodations provisions. This Court should decline Defendant's invitation.

Defendant makes three critical errors in its construction of the public-accommodations provisions of the DCHRA.[3] First, it ignores an unbroken line of precedent from the District of Columbia Court of Appeals mandating how the DCHRA is to be interpreted. In exercising its supplemental jurisdiction under 28 U.S.C. § 1367(c) over Plaintiffs' claims under the DCHRA, this Court's role is well-established. The Court is "bound by the law of the District of Columbia, as authoritatively interpreted by the D.C. Court of Appeals." *Hall v. Ford*, 856 F.2d 255, 267 (D.C. Cir. 1988). If the D.C. Court of Appeals has not ruled definitively on an issue of state law, the Court must construe the law as it predicts the D.C. Court of Appeals would interpret it. *See Griffith v. Lanier*, __ F.3d __, 2008 WL 900978, at *3 (D.C. Cir. April 4, 2008).

The D.C. Court of Appeals has rejected definitively and authoritatively Defendant's cramped, hyper-technical approach to interpreting the Human Rights Act. "The Human Rights Act is a broad remedial statute, to be generously construed." *Blodgett v. Univ. Club*, 930 A.2d 210, 218 (D.C. 2007). "The Council undoubtedly intended the Human Rights Act to be a powerful, flexible, and far-reaching prohibition against discrimination of many kinds . . . ." *Dean v. District of Columbia*, 653 A.2d 307, 319 (D.C. 1995). "[T]he DCHRA should be accorded a broad enough construction to make a remedy available from those forms of discrimination which the statute does reach." *Executive Sandwich Shoppe, Inc. v. Carr Realty, Corp.*, 749 A.2d 724, 732 (D.C. 2000). Defendant's reading of the Human Rights Act is not

---

[3] Defendant makes a host of minor errors as well. For example, it begins its argument with a quotation intended to show that the D.C. Court of Appeals has recognized the ADA and the Human Rights Act differ in "significant ways." *East v. Graphic Arts Indus. Joint Pension Trust*, 718 A.2d 153, 159 (D.C. 1998). The D.C. courts have done nothing of the sort. *East* did not even mention the ADA. Instead, it held that the Human Rights Act is different from the Age Discrimination in Employment Act and Title VII of the Civil Rights Act of 1964.

generous; indeed, its interpretation is almost as miserly as its efforts to make Circa accessible to patrons who use wheelchairs.

Under an appropriately broad construction, there is no doubt that the DCHRA requires reasonable accommodations, such as complying with the requirements of federal law.  District of Columbia precedent directs those seeking to construe the DCHRA to the Act's legislative history.  Resort to legislative history may no longer be in vogue in some circles in interpretation of federal statutes, but there is no doubt that D.C. law mandates its use in construing D.C. statutes.  The D.C. Court of Appeals continues to rely on "legislative history to ensure that [statutory] interpretation is consistent with legislative intent." *Richardson v. United States*, 927 A.2d 1137, 1139 (D.C. 2007).  And the legislative history of the DCHRA could not be clearer that public accommodations must make reasonable accommodations for persons with disabilities.  The committee report on the DCHRA stated that the legislation reflected "the basic principle that each and every person seeking access to facilities and opportunities in the District of Columbia has a right to be considered for such access on the basis of individual merit and a right to expect <u>reasonable accommodations</u> to be made, in so considering, in deference to individual uniqueness." *Gay Rights Coal.*, 536 A.2d at 32 (emphasis added) (quoting District of Columbia City Council, Committee Report on Title 34, "The Human Rights Law," 2 (Aug. 7, 1973)).

Reasonable accommodations are all that Plaintiffs have sought from Circa—the opportunity to enter Circa and enjoy its offerings with the same independence and dignity that its other patrons enjoy.[4]  When the Committee stated that the DCHRA would require facilities in the District of Columbia to make reasonable accommodations of individual uniqueness, it was

---

[4] Plaintiffs note that even if this Court finds that the DCHRA does not incorporate the Standards in their entirety, dismissal is inappropriate.  Plaintiffs have alleged that Defendant failed (and continues to fail) to make reasonable accommodations of their disabilities.

invoking a standard used in federal regulations that carried with it an accepted meaning. *See* 29 C.F.R. § 1605.1(c) (1967) ("Because of the particularly sensitive nature of discharging or refusing to hire an employee or applicant on account of his religious beliefs, the employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable."). For example, in *Riley v. Bendix Corp.*, 464 F.2d 1113 (5th Cir. 1972), the court confronted the question of "reasonable accommodation" for religious belief. The employer, without discriminatory intent, assigned a Seventh Day Adventist to work a shift that ended after sundown on Friday, in violation of the employee's religious beliefs. *Id.* at 1114. When he did not show up for work, he was fired. *Id.* The court, interpreting the regulations requiring reasonable accommodation of religious needs, held that the employer had violated the law. *Id.* at 1115. The court suggested that reasonable accommodations could include affirmative steps such as transferring the employee to another shift, arranging for a substitute, or permitting the employee to be absent from work and deducting those hours from his pay. *Id.* *See also Reid v. Memphis Publ'g Co.*, 468 F.2d 346 (6th Cir. 1972) (requiring reasonable accommodations for a Seventh Day Adventist potential employee).

Similarly here, Defendant's failure to make reasonable accommodations for patrons who use wheelchairs constitutes unlawful discrimination on the basis of disability. Those reasonable accommodations would include taking affirmative measures to provide an entrance, tables, service counter, and restroom facilities that could be used safely and independently by persons who use wheelchairs. Defendant does not and cannot dispute that the facts alleged in Plaintiff's complaint permit the reasonable inference that it failed to make reasonable accommodations for those with disabilities, as required by the DCHRA.

24

Even if Defendant were correct in its general approach to interpretation of the DCHRA, which it is not, it would still be incorrect as to the specifics. Its second major error is to argue that Title III of the ADA and the DCHRA's public accommodations provisions are so different that the D.C. cases incorporating federal standards should not apply. Defendant seemingly concedes that if the ADA and the DCHRA are analogous, then D.C. law incorporates the standards used in federal law as its own, as Judge Hogan stated in *Paralyzed Veterans*. Defendant's argument that Title III of the ADA and the DCHRA are not analogous reflects a misreading of both the ADA and the DCHRA. As explained earlier, Title III of the ADA and the DCHRA use identical language. In fact, the effects clause of the DCHRA goes farther in prohibiting discrimination than does the ADA. Moreover, the ADA does not, as Defendant implies, have two different and unrelated sections—one forbidding discrimination and another requiring reasonable accommodations. Instead, the ADA *defines as discrimination* the failure to make reasonable accommodations. *See* 42 U.S.C. § 12182(b)(2)(A)(ii), (iv) ("[D]iscrimination includes . . . a failure to make reasonable modifications in policies, practices, or procedures [and] a failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable [and] a failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable."); U.S. Department of Justice, ADA Title III Technical Assistance Manual § III-3.1000 (The specific requirements . . . are all designed to effectuate the general requirements."). In other words, the ADA simply spelled out what had already been implicit in the DCHRA: The failure to take reasonable affirmative steps to make public accommodations accessible to patrons who use wheelchairs is intentional discrimination. Moreover, the ADA postdated the Human Rights Act, so the Court should not draw any conclusion from the fact that the Human Rights Act does not incorporate the ADA's specific

prohibitions. Rather, at worst, the Court should conclude that the definition of "discrimination" is ambiguous and turn to the legislative history of the Human Rights Act. As quoted above from *Gay Rights Coalition*, that history shows that the Council intended the Human Rights Act to require public accommodations to make reasonable accommodations for individual unique characteristics. And although there may be some factual debate as to what accommodations are reasonable, at minimum the federal standards are probative evidence of whether any accommodations are reasonable under D.C. law.

The public accommodations provisions of the Act guarantee "full and equal enjoyment" of facilities and services. Defendant does not rely on the plain language of the statute to support its argument that it had no affirmative obligations to accommodate patrons with disabilities. This is because nothing in the words "full and equal enjoyment" suggest that Defendant is not required to take reasonable affirmative steps to accommodate the needs of those with disabilities. Quite the contrary. The plain language of the statute implies that a public accommodation must reach an outcome—ensuring that people with disabilities are provided "full and equal enjoyment" of its facilities and services—and therefore that some reasonable steps must be taken to do so.

Because it can find no support for its position in the plain language of the statute, Defendant commits its third major error: It argues that because the D.C. Human Rights Commission has not promulgated regulations regarding public accommodations, the District of Columbia did not intend to require public accommodations to take affirmative actions to accommodate those with disabilities. This argument is incorrect for two reasons. First, Defendant cites no case addressing its argument in the context of the discretionary decision not to promulgate regulations. There could be countless reasons why an administrative agency like

the Commission would not issue public accommodations regulations, such as limited resources. The decisions Defendant cites stand for the proposition that when Congress (not an administrative agency) enacts a statute and uses different language in two sections of the same statute, it does so intentionally. That is not the situation here. A municipal agency is free to adopt regulations in piecemeal fashion without creating the implication that it intends no such requirements in other as-yet unregulated areas. Second, even if the Commission consciously decided not to promulgate public accommodations regulations, that decision, made long after the DCHRA was enacted, offers no insight into the intention of the legislature when it passed the public accommodations provisions of the DCHRA.

Faced with (1) a prior decision of this Court, (2) legislative history showing that the drafters of the statute intended reasonable accommodations to be made; (3) a longstanding tradition of D.C. courts incorporating federal standards in their anti-discrimination laws; and (4) nearly identical statutory language, Defendant cannot point to a single authority—a statute, a regulation, a case (holding or dicta), a decision of the D.C. Human Rights Commission, an excerpt of legislative history, or even a treatise or law review article—holding that discrimination under the Human Rights Act does not include the failure to make reasonable accommodations for persons with disabilities. Defendant's tortured statutory construction, which is inconsistent with the interpretive approach mandated by the D.C. Court of Appeals, does not hold together. As the legislative history makes clear, the Human Rights Act requires a public accommodation to make reasonable accommodations of patrons who use wheelchairs. Plaintiffs' complaint, which details Defendant's repeated refusals to provide an accessible entrance to its restaurant after over a year of operation, states a plausible claim that Defendant has failed to make reasonable accommodations for individuals with disabilities.

Defendant's refusal to make reasonable accommodations has denied Plaintiffs' the full and equal enjoyment of its facilities and services. Indeed, Defendant has done much more than deny Plaintiffs the "full and equal" enjoyment of its facilities and services; by refusing to provide an accessible entrance to the restaurant, it has denied Plaintiffs and those who use wheelchairs *any* enjoyment of its facilities. Moreover, by refusing to post any signage explaining how individuals with disabilities could enter the restaurant, Defendant has sent a clear and unmistakable message that those with disabilities are unwelcome at Circa. And even if an individual in a wheelchair was able to gain access to the interior of the restaurant, Defendant has ensured their enjoyment of the facility will be less than "full and equal." Until recently, Defendant provided no tables at which an individual in a wheelchair could eat. It left furniture in the restrooms such that an individual could not independently enter and exit the restrooms. And its inaccessible service counter meant that during a large portion of the day, able-bodied patrons could enjoy take-out service, while those in wheelchairs could not. Through its refusals to provide access to and its failure to make reasonable accommodations for those with disabilities, Defendant has denied Plaintiffs the full and equal enjoyment of its facilities and services. Plaintiffs have therefore stated a claim under the DCHRA upon which relief can be granted.

**2.    Plaintiffs Have Also Stated a Case of Intentional Discrimination.**

Even if Defendant were correct that the DCHRA does not require reasonable accommodations, which it is not, Plaintiffs have stated a claim under the DCHRA. It is undisputed that Defendant is in violation of the ADA. And it is also undisputed that "[w]hen Circa at Dupont made alterations to the site prior to opening the restaurant, it closed the entrance on Connecticut Avenue and removed the exterior handles on that entrance's doors." Complaint ¶ 25. Therefore, when Defendant took possession of the premises, there were two entrances to

the restaurant. One was blocked by a five-inch step; the other was not. Defendant closed, locked, and blocked the only entrance wheelchair users could potentially use independently; this action indisputably denied individuals who use wheelchairs the full and equal enjoyment of Circa's services. Defendant's continued refusal to bring its restaurant, especially at its entrance, rapidly into full compliance with the ADA permits an inference that it was and is acting with discriminatory intent. And even if it does not, *Gay Rights Coalition* squarely holds that the effects clause of the DCHRA does not require discriminatory intent. Given Plaintiff Fiedler's repeated email statements to Defendant regarding the unlawfulness of its entrance and Defendant's abject failure to provide access to the restaurant until a lawsuit was imminent, it is a reasonable inference that Defendant, for a discriminatory reason, intended to deny persons using wheelchairs the full and equal enjoyment of its restaurant. It is also a reasonable inference that this action had an impermissible disparate impact on persons who use wheelchairs. Under *Twombly*, the Court need go no further than this fact and its logical inferences in denying Defendant's Motion to Dismiss.

## III.
## CONCLUSION

Before Defendant opened its restaurant, it closed the only entrance to the premises that persons in wheelchairs could use, and it offered patrons in wheelchairs no legal, alternative way of entering the restaurant. For over a year, Defendant has denied customers who use wheelchairs the "full and equal enjoyment" of its services in willful and flagrant violation of the ADA and DCHRA. It made no progress in remedying those violations until it faced litigation from Plaintiffs. Even today, it has not taken the simple step of posting signage to inform disabled customers how they can enter the restaurant. Under these facts, Defendant has not established that the violations it claims to have remedied will not recur. Therefore, those claims are not

moot, and this Court retains jurisdiction to adjudicate their legality. Moreover, Plaintiffs have

stated a claim upon which relief can be granted under the DCHRA. Under the interpretive

approach mandated by the D.C. Court of Appeals, there is no doubt that the DCHRA

incorporates the ADA Standards for Accessible Design. Even if there were, Plaintiffs have

stated a claim of intentional discrimination. Defendant's Partial Motion to Dismiss should

therefore be denied.

Respectfully submitted,

Dated: April 29, 2008

Alan Swirski, Bar No. 420046
1440 New York Ave., NW
Washington, DC  20005
Telephone:  (202) 371-7610

Elaine Gardner, Bar No. 27162
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, DC  20036
(202) 319-1000

Attorneys for Plaintiffs Marc Fiedler and
Equal Rights Center

**EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARC FIEDLER | * |
| and | * |
| EQUAL RIGHTS CENTER, | * |
| | * |
| Plaintiffs, | * |
| | * CIVIL ACTION NO. 1:08-cv-00225-PLF |
| v. | * |
| | * |
| MHG CAFÉ DUPONT, LLC, | * |
| | * |
| Defendant. | * |
| | / |

## DECLARATION OF MARC FIEDLER

I, Marc Fiedler, declare and state as follows:

1.      I am a plaintiff in this matter.  I offer this Declaration in support of Plaintiffs' opposition to Defendant's partial motion to dismiss Plaintiffs' complaint or to strike certain allegations.  The statements set forth in this Declaration are based upon my personal knowledge.

2.      I have physical impairments that limit me in the major life activities of walking and performing everyday tasks.  I use a wheelchair for mobility.

3.      After reading about the opening of Circa at Dupont ("Circa"), I attempted to visit the restaurant on July 14, 2007.  There is a step approximately five inches high at Circa's Q Street entrance.  This step prevented me from even reaching the door of the restaurant.  There was no signage outside the restaurant explaining how a person in a wheelchair could enter.  I remembered that a prior tenant of the premises, Wrapworks, had propped open the doors to the restaurant entrance on Connecticut Avenue.  Those doors are almost level with the adjacent sidewalk.  I saw that the doors at the Connecticut

Avenue entrance to Circa had been closed, locked, stripped of their door handles, and blocked with furniture inside the restaurant. Because there was no accessible entrance to the restaurant, I was unable to enter Circa.

4. I sent an email to Defendant's President, Stephen Gavula, and to its Chief Operating Officer, Matthew Carlin, noting the lack of an accessible entrance and explaining why the situation at Circa was unlawful. A copy of that email is attached as Exhibit A to Defendant's partial motion to dismiss Plaintiffs' complaint or to strike certain allegations. Mr. Carlin responded, acknowledging what he described as my "unfortunate and unacceptable experience" at Circa. A copy of his response is in Exhibit A as well.

5.    I met with Mr. Carlin outside Circa the following week. At this meeting, I discussed with Mr. Carlin the legal rights guaranteed by the ADA. Mr. Carlin expressed a preference for constructing an accessible entrance on Q Street. I explained to him that an accessible entrance on Connecticut Avenue would be preferable because (1) it would be easier to obtain the necessary permits, (2) it would not require a ramp, which is more difficult and more dangerous for everyone to use, and (3) it would likely prove less expensive. Mr. Carlin also showed me a portable ramp he had purchased to allow individuals in wheelchairs to gain entry to the restaurant. I told him that the portable ramp plainly violated the ADA because that statute does not permit use of a portable ramp in Circa's circumstances and because, among other things, it did not have a level top landing and was too steep.

6.    In response to my query as to how access for people with disabilities would be provided at Circa till a permanent solution could be implemented, Mr. Carlin,

in an August 10, 2007, email, a true and correct copy of which is attached hereto as Exhibit 1, stated as follows: "We propose moving one of the mobile tables on the Connecticut Avenue side and leaving that door unlocked – a sign will be posted. Due to weather, it cannot be left ajar."

7.    I visited Circa on September 1, 2007, and September 8, 2007. On both occasions, the Connecticut Avenue entrance to Circa was shut. There were no handles or other hardware to open the door. A long table or counter was placed directly in front of the interior side of the door. I saw no sign explaining how an individual in a wheelchair could access the restaurant. Although the temperature outside was about 90°, the door at the Q Street entrance was propped open, but it had no ramp.

8.    I again sent an email to Mr. Carlin on September 28, 2007, a copy of which is attached as Exhibit C to Defendant's motion. I asked Mr. Carlin, until Circa implemented a permanent accessibility solution, if Circa would provide a means of independent access for people with disabilities. Mr. Carlin never responded to my email.

9.    Because of the lack of a safe, accessible, and independently usable entrance, I have never entered Circa.

I state under penalty of perjury that the foregoing is true and correct.

Washington, DC
April 28, 2008

_____
Marc Fiedler

**EXHIBIT B**

## Marc Fiedler

**From:** <mcarlin@mhggroup.com>
**To:** <mfiedler@starpower.net>
**Sent:** Friday, August 10, 2007 1:57 PM
**Attach:** CIRCA_Exterior_Plan.pdf; grate.pdf; LCN7910.pdf; ADA_sign.png
**Subject:** Fw: Re: Circa at Dupont

Marc - I'll will be out of town next week but will follow up with you the following.  Thanks again, Matt

----- Original Message -----

From: "Marc Fiedler"
To: mcarlin@mhggroup.com
Subject: Re: Re: Circa at Dupont
Date: Thu, 9 Aug 2007 16:30:13 -0400

Matt,

    Thank you for forwarding your proposed solution to the wheelchair-access problem at Circa.  Upon review of the materials you emailed to me, here are my questions:

1. With the ramp and platforms on casters, what will prevent them from shifting and separating, creating gaps? *The ramp and platform were meant to have casters on one side only, i.e. two of the four support points.  Due to the sloping of the grade at the entry however, we have been advised by our contractor to have four stationary posts, which should still be maneuverable by two persons.*

2. What is the slope of the ramp? *Per Code, the ramp will be a 1:12 slope.*

3. What is the surface treatment of the ramp? *See attached "grate.pdf" which is approved by ADA.*

4. What is the edge protection of the ramp? *There will be a 33" high handrail along the edges.*

5. What is the edge protection of the platforms? *There will be a 33" high handrail along the edges.*

6. Will the bench on the platform interfere with a wheelchair's maneuvering clearance or turning radius (as appears from the drawing)? *The bench has been moved to the sidewalk.*

7. For a person in a wheelchair approaching the door from the outside, will the door open automatically before the person reaches the platform (i.e., before the person inadvertently gets in the way of the door's swing path)? *See attached "LCN7910.pdf" on page 193 for the RF Actuator which will be installed on a bollard post at the beginning of the ramp, as well as inside the restaurant.*

8. When will the ramp, platforms, and door opener be installed? *This will be determined once all parties involved has given their approvals.  What we do know right now is that the grating has a 6-8 week lead time; the actuators have 1-2 week lead time and the metalwork contractor will need to determine their lead time per these products.*

9. How will you provide access for people with disabilities till then? *We propose moving one of the mobile tables on the Connecticut Avenue side and leaving that door unlocked – a sign will be posted.  Due to the weather, it cannot be left ajar.*

I look forward to your response.

Marc Fiedler

        ----- Original Message -----
        **From:** mcarlin@mhggroup.com
        **To:** mfiedler@starpower.net
        **Sent:** Thursday, August 09, 2007 11:01 AM
        **Subject:** Fw: Re: Circa at Dupont

        Marc,
        Attached is the proposed solution that has been refined slightly since the email to include interior and exterior automated door openers.  We were unable to create a solution moving the front door to Conn. Ave for a number of reasons.  Pepco is thankfully fine with it and we will need to work with DC Public Space for the ramp but after my explanation of why we are doing this they did not foresee any obstacles.  I'm actually going to the beach with my family late tomorrow or early Sat

12/12/2007

**EXHIBIT C**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARC FIEDLER                              *
        and                               *
EQUAL RIGHTS CENTER,                      *
                                          *
            Plaintiffs,                   *
                                          *    CIVIL ACTION NO. 1:08-cv-00225-PLF
            v.                            *
                                          *
MHG CAFÉ DUPONT, LLC,                     *
                                          *
            Defendant.                    *
_____/

## DECLARATION OF JENNIFER CONRAD

I, Jennifer Conrad, declare and state as follows:

1.     I work as the Disability Rights Program Manager for Plaintiff Equal

Rights Center, which is located at 11 Dupont Circle NW, Suite 450, Washington, DC

20036. I offer this Declaration in support of the Plaintiffs' opposition to the Defendant's

partial motion to dismiss the Plaintiffs' complaint or to strike certain allegations. The

statements set forth in this Declaration are based upon my personal knowledge.

2.     I have eight years of personal and professional experience in disability

rights. I have a law degree from Syracuse University College of Law with a certificate

from the Disability Law and Policy Program. While at Syracuse University, I

specifically studied the ADA and other disability rights laws. I also have a Masters in

Education with an emphasis in disability studies.

3.     In January of 2008, I visited the Circa at Dupont restaurant during regular

business hours and inspected the interior and exterior of the restaurant.

4.      All of Circa's tables were inaccessible to wheelchair users.  Each table rested on a pedestal rising from the center of a round base that was so large as to prevent a person using a wheelchair from getting close enough to the table to eat.

5.      The restaurant had a service and ordering counter that was approximately 42 inches high.  This counter was too high for persons in wheelchairs to reach.

6.      There was movable furniture in the restrooms that denied persons in wheelchairs a sufficient turning radius.  The lack of a sufficient turning radius hindered the exit of persons in wheelchairs.

7.      The outdoor dining area was also inaccessible.  To enter the outdoor dining area, a customer was required to first enter the restaurant and then be directed through the restaurant to the outdoor seating area.  A steep unramped step prevented wheelchair access through the door from inside the restaurant.  There was a gate built into the fence surrounding the outdoor eating area, but that gate was too narrow for a person using a wheelchair to fit through.  I did not see any signs advising a person in a wheelchair or otherwise needing assistance on how they could obtain access to the restaurant.  I also did not see any means by which such person could summon an employee for assistance.

I state under penalty of perjury that the foregoing is true and correct.


Executed on April 29, 2008
Washington, DC


                                              Jennifer Conrad

**EXHIBIT D**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARC FIEDLER                          *
and                              *
EQUAL RIGHTS CENTER,                  *
                                 *
        Plaintiffs,                   *
                                 *   CIVIL ACTION NO. 1:08-cv-00225-PLF
        v.                            *
                                 *
MHG CAFÉ DUPONT, LLC,                 *
                                 *
        Defendant.                    *
_____/

## DECLARATION OF E. ELAINE GARDNER

I, E. Elaine Gardner, declare and state as follows:

1.      I am the Director of the Disability Rights Project of the Washington

Lawyers' Committee for Civil Rights and Urban Affairs, which is located at 11 Dupont

Circle NW, Suite 400, Washington, DC 20036.  I offer this Declaration in support of

Plaintiffs' opposition to Defendant's partial motion to dismiss Plaintiffs' complaint or to

strike certain allegations.  The statements set forth in this Declaration are based upon my

personal knowledge.

2.      On April 8, 2008, and April 16, 2008, with the permission of Defendant's

counsel, I inspected the interior and exterior of the Circa at Dupont restaurant.

3.      The restaurant's Connecticut Avenue entrance consists of a door with two

leaves.  During my April 8 visit to the restaurant, the door was closed but unlocked.

Neither leaf of this door is wide enough to permit a wheelchair to enter the restaurant.

One of the leaves is 20½ inches wide, and the other is 22¼ inches wide.  Both leaves

have closers installed, and close automatically.  To enter, a person using a wheelchair

would need to open both leaves at the same time, which is virtually impossible to do unaided when leaves are equipped with closers. There is no automatic door opener on the door.

4.    The threshold at the Connecticut Avenue entrance is 1½ inches high. It has a bevel that extends one inch from the threshold.

5.    Circa has placed a table and chairs near the Connecticut Avenue entrance. When patrons are not seated at the table, the table is pushed against the service counter. The narrow and cramped space for the table is likely to be uncomfortable for Circa's patrons. As shown by the photograph attached as Exhibit 1 to the declaration of Zachary Kagan-Guthrie, the table is on casters and can easily be moved by the restaurant's patrons. If the table is moved, even a short distance, those in the chairs will obstruct the Connecticut Avenue entrance to the restaurant, effectively narrowing it to an inaccessible width.

6.    The service counter appeared to be new. The top of the counter measured 43½ inches from the floor for the full length of the counter. At my visit on April 16, a cash register was situated on the top of the counter. There is no cut out or lowered portion of the counter. On the outer face of this high counter, however, is a 36-inch-wide fold-down ledge, which when opened out is 29 inches above the floor. The purpose of this ledge is unclear. As the ledge is over fourteen inches below the surface of the counter, staff behind the counter cannot reach over the counter and down to the ledge to place a customer's order on the ledge. Nor can a customer hand payment to the person behind the counter by placing it on the ledge. In order to access the ledge, staff from behind the

counter would have to walk the entire length of the service counter and the restaurant's bar, and then back to the ledge, a total of approximately twenty to thirty feet.

7.  During my visit on April 16, 2008, I asked Mr. Gavula about the purpose of the ledge and the status of take-out service at the restaurant. He replied that all patrons are now being directed into the seating area for service, but that occasional take-out service could still happen.

8.  At the April 8 visit, I measured the force needed to open the doors to the Circa restrooms. The door to the men's room requires 10 pounds-force ("lbf") to open, while the door to the ladies room requires 8 lbf.

I state under penalty of perjury that the foregoing is true and correct.

Executed on April 29, 2008
Washington, DC

E. Elaine Gardner

**<u>EXHIBIT E</u>**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARC FIEDLER                              *
     and                                *
EQUAL RIGHTS CENTER,                      *
                                         *
     Plaintiffs,                        *
                                         *  CIVIL ACTION NO. 1:08-cv-00225-PLF
       v.                             *
                                         *
MHG CAFÉ DUPONT, LLC,                     *
                                         *
     Defendant.                          *
_____/

## DECLARATION OF ZACHARY KAGAN-GUTHRIE

    I, Zachary Kagan-Guthrie, declare and state as follows:

    1.    I work as a paralegal for the Washington Lawyers' Committee for Civil Rights and Urban Affairs, which is located at 11 Dupont Circle NW, Suite 400, Washington, DC 20036. I offer this Declaration in support of the Plaintiffs' opposition to the Defendant's partial motion to dismiss the Plaintiffs' complaint or to strike certain allegations. The statements set forth in this Declaration are based upon my personal knowledge.

    2.    On April 10, 2008, I visually examined the exterior of the Circa at Dupont restaurant, but I did not enter the restaurant. I took a photograph of the Connecticut Avenue entrance to the restaurant, a true and correct copy of which is attached as Exhibit A to this declaration.

    I state under penalty of perjury that the foregoing is true and correct.

Executed on April 28, 2008
Washington, DC

Zachary Kagan-Guthrie

**Exhibit 1**



# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MARC FIEDLER                    *
    and                         *
EQUAL RIGHTS CENTER,            *
                                *
    Plaintiffs,                 *
                                *    CIVIL ACTION NO. 1:08-cv-00225
        v.                    *
                                *
MHG CAFÉ DUPONT, LLC,           *
                                *
    Defendant.                  *
_____/

## [PROPOSED] ORDER

    Defendant MHG Café Dupont, LLC's Partial Motion to Dismiss Plaintiffs' Complaint or

to Strike Certain Allegations is DENIED.  It is hereby ORDERED that discovery on Plaintiffs'

claims proceed forthwith.


Dated:                              _____

                                  Paul L. Friedman, U.S. District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MARC FIEDLER                          *
    and                              *
EQUAL RIGHTS CENTER,                  *
                                      *
    Plaintiffs,                    *
                                      *       CIVIL ACTION NO. 1:08-cv-00225
    v.                             *
                                      *
MHG CAFÉ DUPONT, LLC,                 *
                                      *
    Defendant.                     *
_____/

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Plaintiffs' Opposition to Defendant's Partial

Motion to Dismiss Plaintiffs' Complaint or to Strike Certain Allegations, was served via the

Court's electronic filing system upon the following:

        F. Joseph Warin
        Jason C. Schwartz
        Gibson, Dunn & Crutcher LLP
        1050 Connecticut Ave, N.W., Suite 300
        Washington, DC, 20036
        Attorneys for Defendant

        _____
        Alan Swirski