**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Marc Fiedler, *et al.*,

               Plaintiffs,

       v.                            Civil Action No. 1:08CV00225 (PLF)

MHG Café Dupont, LLC,

               Defendant.

**DEFENDANT MHG CAFÉ DUPONT, LLC'S REPLY
MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER
SUPPORT OF ITS PARTIAL MOTION TO DISMISS PLAINTIFFS' COMPLAINT
<u>OR TO STRIKE CERTAIN ALLEGATIONS</u>**

F. Joseph Warin, D.C. Bar No. 235978
Jason C. Schwartz, D.C. Bar No. 465837
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

II. ARGUMENT ............................................................................................................. 2

    A.  PLAINTIFFS' ADA CLAIMS SHOULD BE DISMISSED. ............................... 2

        1.  FIVE OF PLAINTIFFS' ADA CLAIMS ARE NOW MOOT .................. 2

        2.  DEFENDANT IS DILIGENTLY SEEKING TO RESOLVE THE
            ONLY REMAINING ACCESSIBILITY ISSUE. ...................................... 9

    B.  PLAINTIFFS' NOVEL DCHRA CLAIM SHOULD BE DISMISSED. ............. 11

        1.  THE PLAIN LANGUAGE, STATUTORY STRUCTURE, AND
            COMPREHENSIVE LEGISLATIVE SCHEME OF THE DCHRA
            INDICATE THAT IT DOES NOT REQUIRE THE SAME
            AFFIRMATIVE OBLIGATIONS AS THE ADA. .................................... 11

        2.  THE DCHRA DOES NOT EXTEND TO EVERY ALLEGATION
            OF DISCRIMINATION. ....................................................................... 14

        3.  PLAINTIFFS FAIL TO STATE A CLAIM OF UNLAWFUL
            DISCRIMINATION UNDER THE DCHRA. ....................................... 20

III. CONCLUSION ....................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Carey v. Crane Serv. Co., Inc.*, 457 A.2d 1102 (D.C. 1983) ...................................... 13

*Chang v. Inst. for Public-Private P'ships, Inc.*, 846 A.2d 318 (D.C. 2004) ................... 12

*Citizens Ass'n of Georgetown v. Zoning Comm'n*, 392 A.2d 1027 (D.C. 1978) ............... 12, 18

*Clavo v. Zarrabian*, No. SACV03864CJCRCX, 2004 WL 3709049 (C.D. Cal. May 17, 2004) .......................................................................................... 7, 13

*Dean v. District of Columbia*, 653 A.2d 307 (D.C. 1995) ...................................... 16

*East v. Graphic Arts Indus. Joint Pension Trust*, 718 A.2d 153 (D.C. 1998) ............. 12

*Eiden v. Home Depot USA, Inc.*, No. Civ. S-04-977, 2006 U.S. Dist. LEXIS 38423 (E.D. Cal. May 26, 2006) ......................................................................... 9

*Executive Sandwich Shoppe, Inc. v. Carr Realty, Corp.*, 749 A.2d 724 (D.C. 2000) ............ 16, 17

*Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1 (D.C. 1987) ...................................................................................... 18, 19

*Grant v. May Dep't Stores Co.*, 786 A.2d 580 (D.C. 2001) ...................................... 12

*Guerra v. D.C. Rental Housing Comm'n*, 501 A.2d 786 (D.C. 1985) ........................... 13

*Independent Living Res. v. Oregon Arena Corp.*, 982 F. Supp. 698 (1997) ................... 15, 21

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) ...................................... 22

*Mitchell v. Nat'l R.R. Passenger Corp.*, 407 F. Supp. 2d 213 (D.D.C. 2005) ............. 12

*Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*, 950 F. Supp. 393 (D.D.C. 1996) ................................................................................. 16, 20

*Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627 (D.C. Cir. 2002) ....................... 2, 8

*Reid v. Memphis Publ'g Co.*, 468 F.2d 346 (6th Cir. 1972) ...................................... 20

*Richardson v. United States*, 927 A.2d 1137 (D.C. 2007) ...................................... 17

*Riley v. Bendix Corp.*, 464 F.2d 1113 (5th Cir. 1972) .......................................... 20

*Sellick v. Denny's Inc.*, 884 F. Supp. 388 (D. Ore. 1995) ...................................... 14, 21

**TABLE OF AUTHORITIES** *(continued)*

**Page(s)**

*Sharp v. Rosa Mexicano, D.C., LLC*, 496 F. Supp. 2d 93 (D.D.C. 2007) ............................ passim

*Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173 (11th Cir. 2007) ........................7, 8, 9

*Whitbeck v. Vital Signs, Inc.*, 934 F. Supp. 9 (D.D.C. 1996).......................................................21

**Rules**

29 C.F.R. § 1605.1(c)............................................................................................................18

**Treatises**

D.C. Code § 2.1402.11(c) .........................................................................................................12

D.C. Code § 2-1402.21(d).........................................................................................................12

D.C. Mun. Regs. tit. 4, § 1001.7...............................................................................................13

D.C. Mun. Regs. tit. 4, § 513.1..................................................................................................13

D.C. Mun. Regs. tit. 4, § 513.11................................................................................................13

D.C. Mun. Regs. tit. 4, § 513.5..................................................................................................13

ORS § 659.425(4) (1993)...........................................................................................................13

# I.
## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs' own allegations in the Complaint demonstrate that defendant has repeatedly and diligently worked to rectify plaintiffs' concerns about wheelchair accessibility at its small business, the Circa at Dupont restaurant ("Circa"). Indeed, since defendant filed its initial memorandum, it has made additional structural changes to improve accessibility. Despite these significant efforts, plaintiffs have taken increasingly confrontational positions that obscure the two simple issues involved in this case. First, defendant has now rendered moot five of plaintiffs' six Americans with Disabilities Act ("ADA") claims and other issues not mentioned in the complaint, and the remaining claim is expected to be resolved shortly as soon as the necessary permits can be obtained. The significant structural and other changes undertaken by defendant to resolve these claims demonstrate that there is no reasonable expectation that defendant would simply reverse course once this litigation has concluded. Second, plaintiffs' novel theory to obtain compensatory and punitive damages under the District of Columbia Human Rights Act ("DCHRA") lacks statutory support. The text and structure of the DCHRA demonstrate that, in contrast to the ADA, the DCHRA does not contain affirmative obligations for public accommodations. Plaintiffs' argument regarding the legislative history and broad remedial purpose of the DCHRA does not refute that the plain text and structure of the Act do not allow what plaintiffs seek. Plaintiffs have not alleged facts that plausibly suggest a violation of the DCHRA. Accordingly, defendant respectfully requests that this Court reject plaintiffs' request to adjudicate the ADA claims that have been rendered moot and that it dismiss plaintiffs' DCHRA claims.

## II.
## ARGUMENT

**A.    PLAINTIFFS' ADA CLAIMS SHOULD BE DISMISSED.**

**1.    FIVE OF PLAINTIFFS' ADA CLAIMS ARE NOW MOOT.**

In this case, plaintiffs seek injunctive relief under the ADA for alleged violations that defendant has already remedied.  The doctrine of mootness, however, limits a court's subject matter jurisdiction when there is no "more-than-speculative chance" that judicial intervention will be warranted to provide the plaintiffs with their requested relief.  *Sharp v. Rosa Mexicano, D.C., LLC*, 496 F. Supp. 2d 93, 97-98 (D.D.C. 2007).  A defendant's voluntary conduct renders a case moot "if the party urging mootness demonstrates that (1) there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely or irrevocably eradicated the effects of the alleged violations."  *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002) (quotations and citation omitted).  As defendant explained in its initial memorandum, it has completely remedied several of plaintiffs' concerns through voluntary action.  Accessible tables have been installed, furniture has been moved, and the restaurant's hours of operation have been altered so that wait service is now available during all business hours.  *See* Gavula Decl. ¶¶ 2-5; D. Br. at 5-6.  In addition, since defendant filed its initial memorandum, it has continued to address plaintiffs' concerns by removing a bakery case, installing a new bar with a retractable shelf, installing a new gate to the outdoor seating area, installing signage to direct disabled individuals at both entrances and outside restrooms, and correcting the force needed to open restroom doors.[1]  *See* Supp. Gavula Decl. ¶¶ 4-5; Second

---

[1]  Defendant has installed signage and corrected the force needed to open restroom doors even though these allegations are not mentioned in the complaint.

2

Supp. Gavula Decl. ¶¶ 2, 4, 5, 6.  At this time, defendant has fully addressed five of plaintiffs'

six ADA claims.  In addition, defendant has made significant efforts to address the final ADA

claim:  Defendant has already had a new door made for the Connecticut Avenue entrance and is

seeking the relevant permits so that the door can be installed.  Second Supp. Gavula Decl. ¶ 8.

Courts have determined mootness by evaluating a defendant's voluntary remedial actions

on a barrier-by-barrier basis.  *See* D. Br. at 8.  Thus, there is no legal significance in plaintiffs'

attempts to deflect the focus of defendant's motion to dismiss away from the five alleged

violations that have been fully rectified to the one issue that the defendant is working to fix.  In

considering the Court's subject matter jurisdiction over plaintiffs' six distinct ADA claims, it

simply does not matter that "Mr. Gavula . . . could not and did not state that Circa has remedied

all of its ADA violations."  *See* P. Br. at 10.  These five alleged violations have also been

resolved in relatively short order, as there is no indication that defendant was aware of these

issues until after plaintiffs informed defendant of the results of their January 2008

"investigation."  *See* Compl. ¶ 35.  Fiedler himself has recognized that the only ADA claim

remaining, the entrance, is a difficult and time-consuming matter that requires going through a

lengthy permit process.  *See* P. Br. at Exh. A (Fiedler Decl.) ¶ 5.  That is why Fiedler voiced his

preference for a Connecticut Avenue entrance, stating that "it would be easier to obtain the

necessary permits."  *Id.*  Nevertheless, defendant is in the process of obtaining those permits.

In an attempt to avoid dismissal on the basis of mootness, plaintiffs offer unsupported

speculation concerning defendant's motives for alleviating the concerns identified by the

plaintiffs.  However, there is no reason to suspect that defendant's remedial efforts will be

undone.  To the contrary, defendant's efforts cannot be dismissed as "insubstantial and easily

reversed" because they involve substantial and costly changes to both physical structures and

policies at the restaurant. *See* P. Br. at 12. Thus, plaintiffs statement that "[p]lans and intentions have a funny way of changing once the threat of liability disappears," *see id.* at 13, is inapposite because (1) defendant has made significant structural changes that cannot be undone; (2) as described in more detail below, these structural changes effectively mandate that defendant continue its policy changes; and (3) if defendant were to reverse its course, it would again face the risk of liability. *See Sharp*, 496 F. Supp. 2d at 99 ("The alleged discrimination cannot reasonably be expected to recur because 'structural modifications . . . are unlikely to be altered in the future.'" (citations omitted)).

Defendant will address the five mooted violations *seriatim*. First, plaintiffs allege that Circa had "restrooms in which the requisite wheelchair turning space had been obstructed by the placement of furniture, in violation of Standards §§ 4.2.3 and 4.22.3." Compl. ¶ 35(c). Likewise, the declaration submitted by plaintiffs complained of the same issue: "There was movable furniture in the restrooms that denied persons in wheelchairs a sufficient turning radius. The lack of a sufficient turning radius hindered the exit of persons in wheelchairs." *See* Conrad Decl. ¶ 6. Defendant has removed furniture from its restrooms as requested by plaintiffs. *See* Gavula Decl. ¶ 3. Yet, although defendant provided plaintiffs with all the relief they requested, plaintiffs now assert that defendant's effort was "insubstantial and easily reversed." *See* P. Br. at 12. This contradiction does not withstand scrutiny. Plaintiffs offer no theory as to why defendant would want to replace the furniture, and it is not plausible that defendant would inexplicably reverse course. Despite plaintiffs' protestation about the quality of defendant's effort, defendant has done everything that plaintiffs have asked concerning the restroom. Plaintiffs' own complaint, to which plaintiffs are bound, admits that removing the furniture from the bathroom provides "the requisite wheelchair turning space." Compl. ¶ 35(c). Defendant's

4

inadvertent error in the initial declaration regarding the restroom, which was corrected on defendant's own initiative, should not serve as a basis to deny mooting this claim. It is unfathomable that a claim that plaintiffs admit has been resolved cannot be mooted.[2]

Second, the Complaint alleges that Circa had "a lack of accessible tables that wheelchair users could access or utilize in violation of Standards §§ 4.32 and 5.1." Compl. ¶ 35(a). In response to this allegation, defendant installed accessible tables. *See* Gavula Decl. ¶¶ 4-5; Supp. Gavula Decl. ¶ 3. Plaintiffs admit that the tables are accessible, but attempt to quibble about the timing of defendant's efforts, stating that "it could have taken the same steps months ago." *See* P. Br. at 13. Yet there is no indication that defendant was aware of an accessibility issue with respect to the tables until plaintiffs informed defendant of the results of their January 2008 "investigation" at Circa. Compl. ¶ 35. When plaintiffs brought this issue to defendant's attention, it promptly obtained and installed accessible tables. Plaintiffs do not articulate a plausible reason why defendant would go through the expense of installing accessible tables just to remove them once litigation ends.

---

[2] In addition, plaintiffs attempt to assert new ADA allegations concerning the restrooms for the first time in their opposition to this motion: "the restrooms are also in violation of the Standards. The force required to open the doors to each restroom exceeds the legal limit." *See* P. Br. at 10. This new allegation is procedurally improper because plaintiffs cannot foist upon defendant allegations not contained in the Complaint. *See Sharp*, 496 F. Supp. 2d at 97 n.3 ("The Court agrees that plaintiff may not, through summary judgment briefs, raise the new claims regarding the insulation, grab bars, and signage because plaintiff did not raise them in his complaint, and did not file an amended complaint." (citations omitted)). Notwithstanding the procedural deficiency, defendant has looked into the door force issue. The door closers that defendant purchased for the restrooms were manufacturer certified ADA compliant. *See* Second Supp. Gavula Decl. ¶ 3. When measured, however, the force apparently exceeded 5 pounds force. *See id.* ¶ 4. Accordingly, defendant has reduced the door force to comply with ADA standards. *Id.* Defendant has also added signage announcing wheelchair accessibility at each restroom. *Id.* ¶ 5. There is no reason why defendant would want to increase the door force in the future or remove signage, so this claim has been rendered moot as well.

Third, the Complaint alleges that "an outdoor eating area . . . was inaccessible to wheelchair users due to a step at its entrance from the restaurant . . . and a narrow gate that prevented access at its entrance from Q Street, in violation of Standards §§ 5.4, 4.3.3, and 4.13.3." Compl. ¶ 35(d).  In response to this allegation, defendant made a significant structural change by removing the narrow gate, widening the path, and installing a new gate with a clear opening of more than 32 inches.  *See* Gavula Decl. ¶ 6; Supp. Gavula Decl. ¶ 4.  Plaintiffs gloss over the fact that the new gate is a significant structural change that cannot easily be undone.[3]

Fourth, the Complaint alleges that, "during breakfast hours, there was no wait service, and orders had to placed, paid for, and received by customers at the inaccessible service and ordering counter." Compl. ¶ 36.  Defendant has now made wait service available for all customers during all hours in which the restaurant is open.  *See* Gavula Decl. ¶ 2.  The cash register has been moved so that it no longer sits on the counter.  *See* Second Supp. Gavula Decl. ¶ 6.  In addition, a host is available to take an order for any patron who does not wish to be seated.  *See id.*  Therefore, during all business hours, no patron is required to place, pay for, and receive orders over the counter.

Fifth, these changes also render moot plaintiffs' allegation that Circa had "a service and ordering counter that exceeded the maximum height allowance in violation of Standard § 7.2(1)." Compl. ¶ 35(b).  Defendant has removed a large bakery case from its bar area and installed a new bar, which includes a retractable shelf that is at least 36 inches wide and less than

---

[3] Plaintiffs also attempt to assert new allegations related to the outdoor seating area, alleging that "without signage announcing the procedure, a patron in a wheelchair will not know how to gain access to the patio." *See* P. Br. at 13.  As noted above, plaintiffs cannot submit new claims in this manner.  Nevertheless, defendant has already rectified this situation by placing signage at the Connecticut Avenue and Q Street entrances.  Second Supp. Gavula Decl. ¶ 2.

36 inches off the finish floor when in use. *See* Supp. Gavula Decl. ¶ 5. These are structural

changes that cannot reasonably be expected to recur as a matter of law. *See Sharp*, 496 F. Supp.

2d at 99. Furthermore, these structural changes underscore defendant's commitment to

providing the wait service mentioned above because defendant cannot feasibly reverse its

decision to provide wait service during all hours of operation. The removal of the bakery case

means that defendant cannot return to the breakfast counter service that it formerly provided.

Thus, it is simply not true, as plaintiffs assert, that "[t]here is nothing to stop Defendant from

discontinuing its new business hours and wait-service policy as easily as it instituted them." *See*

P. Br. at 13. Nor can it be said that defendant's structural changes to the bar and counter area are

insignificant or easily reversed.

Defendant's actions are easily distinguishable from the cases cited by Plaintiffs in their

brief. *See* P. Br. at 14-15. *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173 (11th Cir.

2007), and *Clavo v. Zarrabian*, No. SACV03864CJCRCX, 2004 WL 3709049 (C.D. Cal.

May 17, 2004), are unpersuasive. As an initial matter, the *Sheely* standard cited by plaintiffs, P.

Br. at 14, does not apply in this Court. Defendant need only show, on a barrier-by-barrier basis,

"that (1) there is no reasonable expectation that the alleged violation will recur, and (2) [that]

interim relief or events have completely or irrevocably eradicated the effects of the alleged

violations." *Pharmachemie*, 276 F.3d at 631. However, even applying the *Sheely* standard, there

can be no inference of intentional discrimination and no doubt that defendant's remedial efforts

were not timed to anticipate litigation for several reasons. First, defendant has repeatedly sought

to accommodate Fiedler and other patrons using wheelchairs through both continual

communication and concrete changes dating back well before any threat of litigation. *See*

Compl. ¶¶ 28, 33, 40, 43; D. Br. at Exh. D. Second, upon the recommendation of another

7

disabled patron, defendant has provided a temporary solution to the only remaining accessibility issue in the form of an interim ramp that can be installed upon request. *See* Compl. ¶¶ 28, 30, 33; D. Br. at Exh. A (July 18 email). And, although plaintiffs omitted attachments evidencing defendant's "proposed solution" referenced in the email in P. Br. at Exh. B, these attachments illustrate that defendant engaged in costly planning – having designs drawn by an architectural firm – in an attempt to provide a ramp to the Q Street entrance. *See* Exh. A, attached hereto. Third, plaintiffs have not set forth any reason for defendant to discriminate, and it is illogical to think that defendant would have intentionally invited the expense of its remedial efforts and litigation. Fiedler himself admitted the possibility that defendant had entirely innocent intentions, stating "[t]hat [discrimination] may not be your intent . . . ." *See* D. Br. at Exh. A.

This case bears no resemblance to the factual circumstances present in *Sheely* and *Clavo*. This case does not involve a deeply entrenched policy, as seen in the no guide animal policy that was enforced over a number of years in *Sheely*. *See* 505 F.3d at 1185. Plaintiffs have not identified, particularly with the indoor changes to the restaurant that have been rendered moot, how Circa's initial use of a bakery case and having furniture in restrooms were somehow "entrenched." *Sheely* also involved a change of policy that "came almost nine months into this lawsuit, after eight months of discovery and nearly five months of mediation, [which] appears to have coincided with a change in counsel." *Id.* at 1186. With the exception of the entrance, for which the relevant permit applications remain pending, defendant addressed plaintiffs' concerns promptly once they were brought to light. Unlike *Sheely* and *Clavo*, this case is not limited to policy changes; it contains a mix of significant structural modifications and policy changes. Indeed, the structural changes to the bar, counter, outdoor gate that defendant has already made and the changes that are in progress, including the Connecticut Avenue entrance, are either

8

similar to or more significant than some of the "design changes" plaintiffs tout in *Eiden v. Home Depot USA, Inc.*, No. Civ. S-04-977, 2006 U.S. Dist. LEXIS 38423, at *31 (E.D. Cal. May 26, 2006) (replacement of signage, handles, and restroom fixtures), and *Indep. Living Res. v. Oregon Arena Corp*, 982 F. Supp. 698, 775 (D. Or. 1997) (installation of a bicycle rack and fire alarms). Defendant's actions, like Rosa Mexicano's rebuilding of a sink, have altered "*fixture[s]* within the restaurant." *See Sharp*, 496 F. Supp. 2d at 99.

Finally, as noted above, defendant meets *Sheely*'s heavy burden of showing that it will not reverse course. *Sheely* should not be read to preclude all non-structural compliance efforts from mooting a plaintiff's claims. Such a reading would transform a "heavy" burden into one that is insurmountable and would require the courts to unnecessarily retain jurisdiction in cases where the "plaintiff has received everything the court would order." *Eiden*, 2006 U.S. Dist. LEXIS, at *31. Based on the barrier-by-barrier approach, the court should dismiss the five ADA claims in Complaint paragraphs 35(a), 35(b), 35(c), 35(d) and 36 as moot based on the fact that the Court's intervention is no longer necessary to afford plaintiffs their requested relief.

## 2.    DEFENDANT IS DILIGENTLY SEEKING TO RESOLVE THE ONLY REMAINING ACCESSIBILITY ISSUE.

The only remaining issue to be remedied relates to a wheelchair accessible entrance. Defendant has already taken several steps to have an accessible entrance. Defendant's Connecticut Avenue entrance, which consists of two French doors, has had handles installed and those doors are open during all business hours. *See* Compl. ¶ 40; Gavula Decl. ¶ 9. Defendant has also removed interior furniture blocking this entrance. *See* Gavula Decl. ¶ 9. Since filing its initial memorandum, defendant has taken additional measures to ensure that the wheeled table plaintiffs now complain of, *see* P. Br. at 9, will not obstruct the door. *See* Second Supp. Gavula Decl. ¶ 7. Moreover, as mentioned above, defendant installed signage at the Connecticut Avenue

entrance on April 11, 2008. *See id.* ¶ 2. This signage was present when plaintiffs' counsel

visited the restaurant and inspected the Connecticut Avenue door on April 16, 2008. *See*

Gardner Decl. ¶ 2. Notwithstanding this fact, plaintiffs' brief repeatedly took defendant to task

for allegedly not having signage at the door. *See* P. Br. at 1, 3, 12, 13, 17, 28, 29.

Defendant continues to work toward addressing the plaintiffs' concerns by modifying the

Connecticut Avenue entrance. Plans for a new door have been drawn up by the firm of

Adamstein and Demetriou, and a conforming door has already been built at significant expense.

*See* Gavula Decl. ¶ 9. And, rather than simply waiting for the permit process to run its normal

course, defendant has hired a consulting firm, Restaurant Consultants, Inc., to assist with the

permit process. *See id.* In addition, defendant has continually allowed plaintiffs access to Circa

for inspections. *See* P. Br. at Exhs. C and D. Far from evidencing bad faith, *see* P. Br. at 17,

these are serious remedial actions that have involved considerable effort and expense on

defendant's part.[4]

Rome was not built in a day, and defendant could not simply wave a magic wand and

remedy the alleged deficiencies at Circa the same day those deficiencies were brought to its

attention. Defendant did, however, begin cooperating and communicating with plaintiffs the day

plaintiffs voiced their concerns. Defendant has taken a number of steps to fully rectify five of

the six issues that plaintiffs identified in their complaint and the additional issues identified in

plaintiffs' opposition. And Defendant has taken all possible steps to render the Connecticut

Avenue entrance readily accessible by designing and building an accessible door and

---

[4]  As noted in its initial memorandum, defendant has also obtained an interim wheelchair ramp,
which is installed at the request of disabled patrons. This ramp has been successfully
installed and used by disabled patrons a number of times. *See* D. Br. at 2.

commencing the permit process.  Defendant expects to file an additional motion to dismiss or

motion for summary judgment as soon as the remaining work on the Connecticut Avenue

entrance is finalized, which cannot be done until the requisite permits are obtained.  Defendant

has demonstrated that this Court can have a reasonable expectation that defendant will not undo

these changes as soon as this case is dismissed.

**B.    PLAINTIFFS' NOVEL DCHRA CLAIM SHOULD BE DISMISSED.**

    **1.    THE PLAIN LANGUAGE, STATUTORY STRUCTURE, AND COMPREHENSIVE LEGISLATIVE SCHEME OF THE DCHRA INDICATE THAT IT DOES NOT REQUIRE THE SAME AFFIRMATIVE OBLIGATIONS AS THE ADA.**

      Plaintiffs attempt to end-run the ADA's remedial scheme by asserting that the same six

alleged defects that purportedly violate the ADA also constitute violations of the DCHRA.  *See*

Compl. ¶¶ 35-37, 69-79.  However, the DCHRA "is different from the federal statutes in . . .

significant ways."[5] *East v. Graphic Arts Indus. Joint Pension Trust,* 718 A.2d 153, 159 (D.C.

1998).  As demonstrated in defendant's initial brief, the DCHRA cannot be compared to Title III

of the ADA because the former does not impose affirmative obligations in the public

accommodations context.  *See* D. Br. at 10-19.  Therefore, plaintiffs' attempt to obtain

compensatory and punitive damages under the DCHRA fails as a matter of law.

_____

[5]  Plaintiffs are mistaken in their contention that defendant inappropriately relied on this statement.  *See* P. Br. at 22 n.3.  By its terms, this quotation refers to "federal statutes" and does not mention the ADA.  Defendant offers this statement to show that federal civil rights statutes should not be automatically or indiscriminately incorporated into the DCHRA, which differs "in . . . significant ways." *East,* 718 A.2d at 159; *see also Mitchell v. Nat'l R.R. Passenger Corp.,* 407 F. Supp. 2d 213, 240 (D.D.C. 2005).  As defendant has repeatedly noted, federal civil rights precedent is only "persuasive" in construing sections of the DCHRA that are "comparable." *Chang v. Inst. for Public-Private P'ships, Inc.,* 846 A.2d 318, 324 (D.C. 2004); *Grant v. May Dep't Stores Co.,* 786 A.2d 580, 583-84 (D.C. 2001).

The plain statutory language of the DCHRA, coupled with its statutory structure and comprehensive legislative scheme, also leads to the conclusion that the DCHRA does not require public accommodations to undertake affirmative reasonable accommodations. *See* D. Br. at 10-17. In construing a statute, "the starting point must be the language of the statute." *Citizens Ass'n of Georgetown v. Zoning Comm'n*, 392 A.2d 1027, 1032 (D.C. 1978). However, the language of specific "statutory provisions must not be viewed in isolation, but together with related provisions." *Guerra v. D.C. Rental Housing Comm'n*, 501 A.2d 786, 790 (D.C. 1985); *see also Carey v. Crane Serv. Co., Inc.*, 457 A.2d 1102, 1105 (D.C. 1983) ("When interpreting any portion of an act, the statutory meaning of a term or phrase must 'be derived not from the reading of a single sentence or section, but from consideration of [the] entire enactment against the backdrop of its policies and objectives.'" (citation omitted)).

The plain language and structure of the DCHRA indicate that the District of Columbia knows how to enact specific provisions, including provisions that closely mirror federal civil rights statutes, in other contexts including employment and real estate. *See* D. Br. at 13-14. Notably, in enacting protections for individuals with disabilities, other states have incorporated the affirmative provisions of the ADA wholesale into their state civil rights statutes. *See, e.g., Clavo*, 2004 WL 3709049, at *5 (cited in P. Br. at 15-16) (noting that California's Unruh Civil Rights Act and Disabled Persons Act each state that a violation of the ADA constitutes a violation of state law). Therefore, the absence of affirmative obligations, including reasonable accommodations provisions in the DCHRA's public accommodations context, coupled with the express inclusion of these obligations in the employment, *see* D.C. Code § 2.1402.11(c), and real estate contexts, *see* D.C. Code § 2-1402.21(d), is indicative of a legislative decision.

In addition, the comprehensive scheme of the DCHRA shows that the District of Columbia possesses the ability to require affirmative action to protect disabled individuals. The DCHRA's implementing regulations addressing real estate and employment illustrate this ability. As defendant previously described, the real estate regulations require landlords to permit reasonable modifications by disabled tenants. *See* D.C. Mun. Regs. tit. 4, § 1001.7. Similarly, the DCHRA employment regulations specify affirmative actions that employers must take to accommodate disabled employees and expressly incorporates related federal regulations. *See id.* §§ 513.1, 513.5, 513.11. In contrast, the District of Columbia has not enacted regulations in the public accommodations context.

A federal court has already resolved this precise issue in the context of another state's disability discrimination law. In *Sellick v. Denny's Inc.*, 884 F. Supp. 388 (D. Or. 1995), the plaintiff brought a claim under Oregon law on the grounds that a Denny's restaurant had discriminated against a morbidly obese patron by failing to provide a reasonable accommodation in the form of an accessible booth or chair. *Id.* at 392. The Oregon law was similar to the DCHRA's public accommodations provision:

> it is an unlawful practice for any place of public accommodation, resort or amusement . . . or any person acting on behalf of such place, to make any distinction, discrimination, or restriction because a customer or patron is a disabled person.

*Id.* (citing ORS § 659.425(4) (1993)). Similar to the DCHRA, the Oregon law did not contain a reasonable accommodation requirement in its public accommodations provision. *See id.* at 393. Also like the DCHRA, the Oregon scheme contained affirmative requirements with respect to employment. *See id.* On this basis, the District of Oregon "refused to imply such a requirement where, as here, the statute is clear and unambiguous." *Id.*

The District of Oregon also considered whether this analogous Oregon law supports a claim for damages based on passive rather than affirmative conduct in *Independent Living*, 982 F. Supp. at 773. The court considered whether the language quoted above could fairly be read to encompass the defendant's alleged "failure to retrofit a building to be wheelchair accessible, or to install a wheelchair ramp . . . ." *Id.* The court noted that the Oregon law differed from the ADA. The ADA provided different standards for new construction and alteration of existing buildings, but the Oregon law did not. *Id.* In addition, the court noted that the Oregon law had been on the books since the 1970s without a published decision applying the law to similar passive conduct. *Id.* And, as of the time of the *Independent Living* plaintiffs' claim, no regulations had been promulgated. *Id.* at 773-74. In holding that the Oregon law did not support a claim for damages, the court appropriately noted that subjecting passive conduct to the Oregon law would render thousands of existing buildings and businesses vulnerable to a claim for damages. *Id.* at 773.

The District of Oregon's reasoning applies with equal force to plaintiffs' claim under the DCHRA. The DCHRA's plain language differs from the affirmative obligations contained in the ADA; there is no precedent applying the DCHRA to similar conduct; and the District of Columbia has not adopted regulations to support the law's application in this context. Perhaps more important is the fact that application of the non-existent DCHRA affirmative obligations in this case would have wide-ranging implications by rendering large numbers of existing buildings and businesses subject to potentially crushing compensatory and punitive damages.

## 2.    THE DCHRA DOES NOT EXTEND TO EVERY ALLEGATION OF DISCRIMINATION.

Plaintiffs do not directly address defendant's arguments regarding the DCHRA's statutory structure or its legislative scheme. Instead, they rely on (1) the broad remedial nature

of the DCHRA; (2) an isolated passage of legislative history; and (3) *Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*, 950 F. Supp. 393 (D.D.C. 1996), to support their position. These three proffered reasons, however, do nothing to refute defendant's argument that the DCHRA's fails to incorporate Title III of the ADA.

First, plaintiffs' discussion of the broad remedial nature of the DCHRA omits important limitations on the statute's reach. Plaintiffs correctly note that, in *Dean v. District of Columbia*, 653 A.2d 307 (D.C. 1995), cited in P. Br. at 22, the D.C. Court of Appeals stated that "[t]he Council undoubtedly intended the Human Rights Act to be a powerful, flexible, and far-reaching prohibition against discrimination of many kinds . . . ." *Id.* at 319. However, plaintiffs' ellipsis excludes the important qualification that "[t]he Council, however, did not intend the Act to prohibit every discriminatory practice." *Id.* Moreover, although plaintiffs use *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724 (D.C. 2000), cited in P. Br. at 22, to urge the Court to extend the DCHRA to discrimination that is not covered by the statute's terms, the full quotation indicates that this statement was limited to a plaintiff's standing to challenge racial discrimination: "Although we have noted that the Council did not intend the DCHRA to prohibit every discriminatory practice . . . it nevertheless follows that standing under the DCHRA should be accorded a broad enough construction to make a remedy available from those forms of discrimination which the statute does reach." *Id.* at 732 (citation omitted). The statute clearly does not extend to every allegation of discrimination. Therefore, plaintiffs cannot sweep in conduct that was not contemplated by the DCHRA based on an amorphous broad remedial purpose.

Second, plaintiffs inappropriately rely on a vague and isolated statement from the statute's legislative history as a basis to import the entire body of reasonable accommodations

15

law into the DCHRA public accommodations provision. P. Br. at 23 ("The committee report on

the DCHRA stated that the legislation reflected 'the basic principle that each and every person

seeking access to facilities and opportunities in the District of Columbia has a right to be

considered for such access on the basis of individual merit and a right to expect <u>reasonable</u>

<u>accommodations</u> to be made, in so considering, in deference to individual uniqueness.'").

Plaintiffs would have the court believe that, in the District of Columbia, this single statement

overrides all other traditional tools of statutory interpretation. The case cited by plaintiffs,

however, demonstrates the tertiary nature of legislative history in analyzing the meaning of a

statute.

Courts must "begin with the plain language of the statute." *See Richardson v. United

States*, 927 A.2d 1137, 1139 (D.C. 2007) (cited in P. Br. at 23). If "individual sections [are]

capable of more than one reading . . . [courts must] search for an interpretation that makes sense

of the statute and related laws as a whole." *Id.* Defendant's statutory argument does just that,

relying on the structure of the DCHRA and related laws. In contrast, a court turns to legislative

history "*lastly*" to confirm that the interpretation is consistent with legislative intent. *Id.*

(emphasis added). However, only "strong contrary indications in the legislative history" or

"absurd result[s]" can prevail over the literal wording of the statute, which should be viewed

within the context of the whole legislative scheme. *Citizens Ass'n of Georgetown*, 392 A.2d at

1033.

The isolated and general statement that plaintiffs quoted from *Gay Rights Coalition of

Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1 (D.C. 1987) (en banc), is not

sufficient to override the plain language and statutory structure of the DCHRA. *See* P. Br. at 23.

The quoted statement in *Gay Rights Coalition* was an aspirational statement by one council

member. *See* 536 A.2d at 29. This statement was also made in 1973, before the Home Rule Act, while the DCHRA was merely a district regulation. *See id.* at 32-33. It says nothing specifically about disability discrimination. *See id.* at 32. *Gay Rights Coalition* itself does not concern disability discrimination, but discrimination based on sexual orientation. And, importantly, in reviewing the legislative history, the Court of Appeals found that this statement of legislative history was insufficient to establish a compelling governmental interest as a matter of law. *See id.* at 33. Therefore, this single statement is not strong enough to disregard the language and structure of the statute, especially in light of the significant stakes involved in combining the DCHRA's extensive compensatory and punitive damages remedies with the expansive scope of Title III of the ADA.

Plaintiffs also assert that *Gay Rights Coalition*'s discussion of the DCHRA's effects clause controls the Court's decision in this case. *See* P. Br. at 29. However, this discussion is inapposite for two reasons. First, due to defendant's remedial efforts, no discriminatory effects have been felt in this case. These efforts have effectively provided disabled patrons full and equal access to the restaurant regardless of whether it is technically ADA compliant. As noted above, ADA standards should not be incorporated into the DCHRA because the laws are not comparable. Second, *Gay Rights Coalition* considered the legislative history of the DCHRA's effects clause, a concept grounded in employment discrimination theories, and then applied it to a case involving sexual orientation discrimination. *See* 536 A.2d at 29. In the DCHRA's legislative history, one council member explained that, because the effects provision parallels the Civil Rights Act, the public can look to the federal law to answer questions about the administration and enforcement of the DCHRA, which was then a district regulation. *See id.* However, this case does not involve parallel statutory structures, employment discrimination, or

sexual orientation discrimination. Moreover, nowhere do plaintiffs allege that in their DCHRA

claim that wheelchair-bound individuals, *as a group*, have been denied access, only that Fiedler

found the current portable ramp solution unacceptable, *see* D. Br. at 20, despite his

acknowledgement that the permit process will take time, *see* P. Br. at Exh. A (Fiedler Decl.) ¶ 5.

Plaintiffs further attempt to use this remote legislative history and their inordinately

expansive conception of the DCHRA's broad remedial structure to blur the lines between the

distinct contexts of employment and public accommodations. *See* P. Br. at 23-24 (citing 29

C.F.R. § 1605.1(c) (employment); *Riley v. Bendix Corp.*, 464 F.2d 1113 (5th Cir. 1972)

(employment); *Reid v. Memphis Publ'g Co.*, 468 F.2d 346 (6th Cir. 1972) (employment)).

Inexplicably, these employment cases somehow lead plaintiffs to the conclusion that "[s]imilarly

here, Defendant's failure to make reasonable accommodations for patrons who use wheelchairs

constitutes unlawful discrimination on the basis of disability." *See* P. Br. at 24. To the contrary,

these authorities are perfectly consistent with defendant's argument, *see* D. Br. at 10-17, that

plaintiffs cannot rely on the DCHRA's remedial scheme, which is far more detailed with respect

to employment discrimination than public accommodations, to incorporate the affirmative

obligations of Title III of the ADA. Indeed, the relative wealth of precedent in the employment

discrimination context is further proof that this type of discrimination is treated differently under

the DCHRA.

Third, Plaintiffs fail to address defendant's arguments concerning *Paralyzed Veterans of

Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*, 950 F. Supp. 393 (D.D.C. 1996). *See* D. Br. at

15-16. Plaintiffs ignore the fact that, because the plaintiffs in *Paralyzed Veterans* sought only

injunctive relief, Judge Hogan's DCHRA discussion was not necessary to the outcome of the

case: the *Paralyzed Veterans* plaintiffs sought court intervention under the DCHRA to alter the

18

building plans prior to construction of a new sporting arena, *see* 950 F. Supp. at 394 n.2, but

plaintiffs here seek compensatory and punitive damages.  Plaintiffs also omit the fact that

nowhere in the *Paralyzed Veterans* opinion does Judge Hogan compare the plain language,

statutory structure, or comprehensive legislative scheme of the DCHRA to that of the ADA like

the Oregon court did in *Sellick*.  *See Sellick*, 884 F. Supp. at 393.  Plaintiffs also have no answer

for the fact that the primary authority cited in *Paralyzed Veterans* involved an employment

discrimination claim rather than a public accommodations claim.  *See Whitbeck v. Vital Signs,*

*Inc.*, 934 F. Supp. 9, 13 (D.D.C. 1996).  Far from suggesting that Judge Hogan was mistaken,

defendant states that this issue simply was not before the Court in *Paralyzed Veterans*, most

likely because the plaintiffs in that case did not press the novel theory of compensatory and

punitive damages pursued in this case.

      Plaintiffs' argument boils down to the assertion that "the ADA simply spelled out what

had already been <u>implicit</u> in the DCHRA."  *See* P. Br. at 25 (emphasis added).  But the structure

of the DCHRA shows the opposite as did the Oregon disability statute examined in *Sellick*, *see*

884 F. Supp. at 393, and *Independent Living*, *see* 982 F. Supp. at 773-74.  There is no room for

an argument that the ADA's affirmative provisions are "implicit in the DCHRA" because the

statute and its regulations do not leave other discrimination protections implicit.  To the contrary,

the DCHRA and its regulations define discrimination in great detail.  But they do not

contemplate affirmative obligations to adopt reasonable accommodations in the context of public

accommodations.  Furthermore, there is no possible way that the DCHRA could have

incorporated the ADA, which was enacted some 17 years *after* the text of the DCHRA.

Incorporation of the ADA accessibility guidelines and standards is similarly far-fetched, as they

were first published some 18 years after the text of the DCHRA and have been updated even

more recently. The mere idea that such complicated standards concerning, for example, door opening force could have been retroactively and implicitly incorporated in general language concerning non-discrimination offends basic principles of due process. *See Landgraf v. USI Film Prods*, 511 U.S. 244, 265 (1994) ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted."). Thus, viewing the DCHRA's legislative scheme as a whole, the conspicuous absence of statutory language or regulations requiring affirmative action in the public accommodations context leads to the conclusion that such obligations were expressly excluded.[6] Accordingly, the Court should dismiss plaintiffs' DCHRA claims.

### 3.  PLAINTIFFS FAIL TO STATE A CLAIM OF UNLAWFUL DISCRIMINATION UNDER THE DCHRA

As noted in defendant's initial memorandum, plaintiffs have failed to plead, and they cannot prove, facts to support a plausible claim that defendant directly or indirectly denied disabled patrons full and equal enjoyment of its restaurant with a discriminatory reason pursuant to D.C. Code § 2-1402.31(a). Defendant's efforts to address plaintiffs' concerns, which have been repeatedly noted, have resulted in the real accessibility solutions that are currently available. These efforts will not permit any inference of discrimination, as Fiedler himself admitted when he stated that "[t]hat may not be your intent . . . ." *See* D. Brief at Exh. A. In

---

[6] Plaintiffs' statement that "federal standards are probative evidence of whether any accommodations are reasonable under D.C. law" is, therefore, off point. *See* P. Br. at 26. Because the DCHRA does not impose affirmative obligations on public accommodations to make reasonable accommodations, there is no occasion for the Court to decide whether defendant's considerable efforts to address plaintiffs' concerns are reasonable under any standard that plaintiffs might attempt to import from other sources.

addition, these solutions allow disabled individuals the ability to fully and equally enjoy the Circa at Dupont restaurant.

The Court should dismiss plaintiffs' DCHRA claims because plaintiffs have failed to plead facts to support a plausible claim that defendant denied disabled individuals full and equal enjoyment of its restaurant.

## III.
## CONCLUSION

The Court need only consider two simple issues in this case. First, defendant has addressed five of plaintiffs' six concerns under the ADA, rendering them moot. Second, this case does not allege the type of conduct that the DCHRA was designed to remedy. Accordingly, defendant respectfully requests that the Court dismiss plaintiffs' claims concerning the already-rectified ADA violations on the grounds of mootness. Defendant further requests that the Court dismiss plaintiffs' DCHRA claims for failure to state a claim upon which relief can be granted.

Respectfully submitted,

Dated: May 13, 2008

F. JOSEPH WARIN, D.C. Bar No. 235978
JASON SCHWARTZ, D.C. Bar No. 465837
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue N.W.
Washington, District of Columbia 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

Attorneys for MHG CAFÉ DUPONT, LLC,

21

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Marc Fiedler, *et al.*,

        Plaintiffs,

    v.

                               Civil Action No. 1:08CV00225 (PLF)

MHG Café Dupont, LLC,

        Defendant.

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th Day of May, 2008, I caused to be served a copy of the

foregoing Reply Memorandum of Points and Authorities in Further Support of Defendant's

Partial Motion to Dismiss Plaintiffs' Complaint or to Strike Certain Allegations via the Court's

electronic filing system upon the following :

                         Alan Swirski
                         1440 New York Ave., NW
                         Washington, DC 20005

                         Elizabeth Elaine Garner
                         Washington Lawyers' Committee for Civil Rights
                         11 Dupont Circle, NW, Suite 400
                         Washington, DC 20036

                         Benjamin K. Ahlstrom

**EXHIBIT A**





**Grating** | **Mat & Pit**

Self-cleaning!

Special Order



Mat Grating–5# SF
M Series

Pit Grating–7# SF
P Series

SECTION A    (END VIEW)    SECTION A

Shown with optional flange.

(* Stainless steel flange shown is not standard—
Please specify when ordering (1.4# linear ft.)



(TOP VIEW)

DIRECTION
OF TRAFFIC

Stainless Steel 304, Aluminum, Bronze

| Mat Grating –B Series 5#SF | Size | | With Sub-Frame | Without Sub-Frame |
|---|---|---|---|---|
| | **X** | **Y** | **Code** | **Code** |
| Mat Grating –B Series 5#SF | 6" | 6" | M46 | MG46 |
| | 4" | 4" | M48 | MG48 |
| Pit Grating –P Series 7#SF | 6" | 6" | P46 | PG46 |
| | 4" | 4" | P45 | PG45 |
| | 2" | 2" | P24 | PG24 |
| | 2" | 2" | P22 | PG22 |
| | 1" | 1" | P18 | PG18 |
| | 1" | 4" | P14 | PG14 |

# ELECTROHYDRAULIC/PNEUMATIC ACTUATORS & ACCESSORIES
## 7910 & 7920 Series

The actuators and accessories on the following pages (7910 & 7920 Series) are to be used only with LCN electromechanical power operators. When using actuators supplied by others, such as card readers, consult the factory.

The desired function, traffic patterns and physical design of the opening will determine the type of actuators used. Generally, for two-way traffic, an actuator is required on both the interior and exterior side of the door. Each actuator is packaged with a decal to be applied to the controlled door. Scanners operate on 12V DC or 24V DC and may be powered by the LCN 4600 series operator or 7900 series control box, unless otherwise noted. Actuators provide normally open (N.O.) dry contacts.

Note: the following actuators and accessories are to be used with LCN electrohydraulic and pneumatic power operators (2800, 4600 & 4800 Series).

**WALL PLATE ACTUATOR, 7910-956(4 1/2")/7910-952(6")**
Hardwired low voltage actuator with round, stainless steel touch plate in either 4 1/2" (114mm) or 6" (152mm) diameters. Engraved blue filled handicap symbol conforms to most accessibility codes. Designed to mount in 7910 series flush or surface mounting boxes (ordered separately) in/on a vertical surface near the controlled door. Optional mounting in single gang electrical box (by others) for 7910-956 or double gang box (4" x 4") by others) for 7910-952. Heavy industrial grade components provide vandal resistant mounting and weather resistant switch standard.

**SURFACE MOUNT BOX, 7910-968-4/7910-968-6**
Surface mount box for 4 1/2" or 6" round wall plate switches. Heavy-duty design allows fast installation and provides vandal resistant mounting. Includes required fasteners and special sealing plate for weather resistant installations. Wall plate actuator not included.

**FLUSH MOUNT BOX, 7910-969-4/7910-969-6**
Flush mount box for 4 1/2" or 6" round wall plate switches in drywall construction. Heavy-duty design allows fast installation and provides vandal resistant mounting. Includes drywall bracket, required fasteners and special sealing plate. Wall plate actuator not included.

**ESCUTCHEON, 7910-972-4/7910-972-6**
Tapered metal escutcheon covers the gap between the wall and the back of wall plate actuators when mounted in electrical boxes (by others) to minimize cart damage or vandalism. Use 7910-972-4 for 7910-956 actuator, use 7910-972-6 for 7910-952 actuator.

**JAMB MOUNTED ACTUATOR, 7910-918**
Hardwired low voltage actuator with rectangular stainless steel touch plate, 1 1/2" (38 mm) wide by 4 3/4" (121 mm). Engraved blue filled handicap symbol conforms to most accessibility codes. Designed to mount in a frame cutout (template provided) projecting approximately 1/2" (12 mm) from the frame or surface mount box, 7910-919 (sold separately). Heavy industrial grade components provide vandal resistant mounting and weather resistant switch standard.



956    952

968-4    968-6

*Shown with wall plate installed.*

969-4    969-6

*Shown with wall plate installed.*

972-4    972-6



918

LCN CLOSERS
121 W. RAILROAD AVE.
P.O. BOX 100
PRINCETON, IL, USA 61356-0100

PHONE 800-526-2400
FAX 800-248-1460
www.lcnclosers.com
8/04

**Actuators & Accessories**

**LCN®**

# ELECTROHYDRAULIC/PNEUMATIC ACTUATORS & ACCESSORIES
## 7910 & 7920 Series

### SURFACE MOUNT BOX, 7910-919
Surface mount box for 7910-918 rectangular wall plate switch. Heavy-duty design allows fast installation and provides vandal resistant mounting.



### SURFACE MOUNT RF ACTUATOR, 7910-967
Wireless, 9V battery powered RF actuator for use with 7910-931 series receivers. Round, surface mount box comes complete with 4 1/2 (112mm) stainless steel touch plate, with engraved and blue filled handicap symbol. Heavy industrial grade components and special gasketing provide weather resistant installation. See ACTUATOR NOTES 1 and 3 (page 195).



### RF ACTUATOR KIT, BOLLARD MOUNT, 7910-952RF
Wireless, 9V battery powered RF actuator kit with round, stainless steel 6" (152 mm) diameter touch plate. Engraved blue filled handicap symbol conforms to most accessibility codes. Kit to be mounted in a 7910-966 bollard post (order separately) includes transmitter assembly, wire harness and touch plate/battery holder assembly. Heavy industrial grade components provide long service life and a weather resistant installation. See ACTUATOR NOTES #3 (page 195).



### HAND-HELD RF (WIRELESS) ACTUATOR, 7910-930/7910-932
Wireless, 9V battery powered actuation system consists of a short range radio (garage door type) transmitter and a matching receiver (ordered separately). 7910-932 offers two channels for multiple receiver systems. Actuator system may also be used to activate a closer/holder release mechanism, contact LCN for details.



### RF RECEIVER, 7910-931/7910-931-2/7910-931-4
For use with 7910 series RF actuators, locate actuator and receiver so maximum line-of-sight distance does not exceed 50 feet (7.6 m) for best performance. 7910-931 has single channel capability, 7910-931-2 has two channel capability and 7910-931-4 has 4 channel capability. The 7910-931- 4 is particularly well suited to sequential vestibule operations where four separate functions are required and wireless actuation is desired. Input voltage 11-24V DC or 12-16V AC @ .040 amp. Maximum two receivers per 7900 Series control box.



**LCN.**

**193**

LCN CLOSERS
121 W. RAILROAD AVE.
P.O. BOX 100
PRINCETON, IL USA 61356-0100

PHONE 800-526-2400
FAX 800-248-1460
www.lcnclosers.com
8/04

# ELECTROHYDRAULIC/PNEUMATIC ACTUATORS & ACCESSORIES
## 7910 & 7920 Series

### BOLLARD POST, 7910-966
6" square aluminum bollard post for mounting hardwired 6" wall plate actuator 7910-952 (sold separately). Can be configured as a wireless RF actuator by installing 7910-952RF actuator kit with a 7910-931 series receiver. Standard bollard post height is 36" and includes mounting base. Dark bronze finish available on special order.



### TOUCHLESS ACTUATOR, 7920-913
Ideal for clean rooms or similar "hands free" applications. Operator system is triggered by movement near the face of the actuator. Uses the same high performance K-band technology as the 7920-954 motion detector with detection distance adjustable from 1" to 24". Actuator mounts in double gang electrical box (by others) and has a 5" wide by 5 1/2" high, black Plexiglas cover.



### MOTION SENSOR, 7920-954
High performance, K-band microwave sensor detects objects approaching or moving away from the sensor. One way detection can be selected during installation. Maximum mounting height is 10' above floor on door header, wall, or ceiling. Wide zone (13' wide by 6 1/2' deep) detection pattern is standard but optional narrow zone (6 1/2' wide by 8 1/4' deep) can be selected during installation. Sensor can be adjusted using hand-held remote control. For sensors mounted on pull side of the door, refer to ACTUATOR NOTES #2 (page 195). Sensor requires a separate 12V or 24V AC/DC @ 2 watts power supply when used with pneumatic control boxes. Matte black finish



### WEATHER COVER, 7920-954WC
For unsheltered exterior mountings use weather cover. Consult factory.



### DROP CEILING MOUNT, 7920-954ECA
Ceiling mounting plate used to accommodate false ceiling mountings. Consult factory.



LCN CLOSERS          PHONE 800-526-2400
121 W. RAILROAD AVE.   FAX 800-248-1460
P.O. BOX 100           www.lcncloseers.com
PRINCETON, IL USA 61356-0100   6/04

# ELECTROHYDRAULIC/PNEUMATIC ACTUATORS & ACCESSORIES
## 7910 & 7920 Series

**SAFETY SENSOR, HEADER MOUNT, 7920-912**
Protect people on the swing side of the door with an advanced, active infrared technology presence detector. This sensor verifies that people are not in the swing path of the door, even if they are stationary, before allowing the door to open. It also verifies that the opening is clear before allowing the door to close from the open position. Six selectable patterns accommodate wide or narrow, center, left or right detection zones. Microprocessor automatically learns and adapts to site's environmental conditions. 12" x 3" x 2 1/2" Black matte finish. **7920-959 Sensor remote control is required to make adjustments.**



**SAFETY SENSOR, DOOR MOUNT, 7910-904-1/7920-904-2**
For maximum protection of an automated swing door, presence detection must move with the door. Mount a 7920-904 on both sides of the door to protect the leading edge during the entire opening/closing cycle. If a person is detected, the system will not allow the door to open or close. Advanced active infrared technology will protect the leading edge with the 7920-904-1 or the optional 7920-904-2 will protect the entire face of a typical 36" door. Detection distance can be adjusted from 2'3" up to 8' 2" for extra tall doors. Sensor includes required mounting hardware and surface wiring door loop. For concealed wiring use a Von Duprin EPT-10 and required special door preps. 34 3/4" x 1 3/4" x 1 3/4" Black matte finish.



**SENSOR REMOTE CONTROL, 7920-959**
Hand-held remote control can adjust settings on the 7920-954 motion sensor without removing the sensor cover. Maximum range 10'. **Required to adjust 7920-912 Safety Sensor.**



## ACTUATOR NOTES
1. Actuators are generally mounted between a minimum of 15" up to 48" maximum height or as specified in local codes; 36" recommended if no other guidelines available.

2. Position sensor actuators so the scanned area is outside the sweep of the door to avoid actuation by the motion of the door.

3. RF transmitters are powered by a 9V battery, which requires annual replacement under normal usage. Use heavy duty alkaline battery for best performance. Must be used with LCN 7910 series RF Receiver. Locate actuator and receiver so maximum line-of-sight distance does not exceed 50 feet (7.6 m).

**LCN.**  **195**

LCN CLOSERS
121 W. RAILROAD AVE.
P.O. BOX 100
PRINCETON, IL, USA 61356-0100

PHONE 800-526-2400
FAX 800-248-1460
www.lcnclosers.com
8/04



**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Marc Fiedler, et al.,

               Plaintiffs,

         v.                        Civil Action No. 1:08CV00225 (PLF)

MHG Café Dupont, LLC,

               Defendant.

## SECOND SUPPLEMENTAL DECLARATION OF STEPHEN GAVULA

I, Stephen Gavula, declare and state as follows:

1.        I am the President and Managing Member of MHG Café Enterprises, LLC, of which MHG Café Dupont, LLC (dba Circa at Dupont or "Circa"), the named defendant in the above-captioned matter, is a wholly-owned subsidiary. As President and Managing Member, I manage Circa, located at 1601 Connecticut Avenue, NW, Washington, DC, which opened for business on April 17, 2007. My management responsibilities regarding Circa include design and structural issues. I offer this Declaration in support of the defendant's partial motion to dismiss plaintiff's complaint or to strike certain allegations. The statements set forth in this Declaration are based upon my personal knowledge and upon information that I acquired during the regular performance of my duties as President of the MHG Café Enterprises, LLC.

2.        At my direction, there have been a number of additional changes made at Circa. As of April 11, 2008, Circa installed signage announcing wheelchair accessibility at the Connecticut Avenue entrance. In addition, as of May 13, 2008, a sign has been installed at the Q Street entrance to Circa referring disabled customers to the Connecticut Avenue entrance.

3.        Prior to April 8, 2008, Circa purchased door closers for the restroom doors that were manufacturer certified ADA compliant.

4.        In addition, on May 12, 2008, I had the force needed to open the doors to the Circa restrooms measured. The doors measured above five pounds-force ("lbf") to open. Circa has addressed this issue, and later on May 12, 2008, the force needed to open the doors to the Circa restrooms measured 5 pounds-force or less.

5.        Signage announcing wheelchair accessibility has also been installed near each restroom.

6.        As I stated in my declaration of March 24, 2008, wait service is now available during all open hours. Circa has removed the cash register from the top of the counter area where the bakery case used to be located. A host or hostess is also available to take the order of customers who do not wish to be seated and to deliver any order directly to them, without requiring a patron to reach over the counter. Circa does not intend to discontinue these policies in the future. Circa does not intend to return the cash register to the counter area or to change its payment policy in the future.

7.        The table near the Connecticut Avenue entrance has been rotated so that it is perpendicular to the French doors. The unobstructed entrance aisle for wheelchair accessibility is at least 32 inches wide when the doors are open at a 90 degree angle.

8.        Circa is still in the process of obtaining the necessary permits to install a door at the Connecticut Avenue entrance. The door has already been made. The Connecticut Avenue entrance is within plain view of the host table, and the hosts and hostesses at Circa have been instructed to be on the lookout for people with disabilities seeking to gain entrance to the restaurant and to render assistance as necessary. The hosts and hostesses have also been

2

instructed to make sure that the table and chairs near the Connecticut Avenue entrance do not block the entry way to the restaurant.

      9.      The photograph attached hereto as Exhibit 1 is a true and correct copy of a photograph taken on May 12, 2008, which shows Circa's Connecticut Avenue entrance from the restaurant's exterior.

      10.     The photograph attached hereto as Exhibit 2 is a true and correct copy of a photograph taken on May 12, 2008, which shows Circa's Connecticut Avenue entrance from the restaurant's interior.

      I state under penalty of perjury that the foregoing is true and correct.

Washington, DC
May 13, 2008

                                                 Stephen Gavula

**EXHIBIT 1**



**EXHIBIT 2**

